10 Cal.2d 1 (1937)
In the Matter of the Application of THOMAS J. MOONEY for a Writ of Habeas Corpus.
Crim. No. 3898. 
Supreme Court of California. In Bank. 
October 29, 1937.
 Frank P. Walsh, John F. Finerty and George T. Davis for Petitioner.
 U.S. Webb, Attorney-General, William F. Cleary and Emery F. Mitchell, Deputies Attorney-General, for Respondent.
 THE COURT.
 By this proceeding in habeas corpus, the petitioner, Thomas J. Mooney, seeks his release from the custody of the warden of the state prison at San Quentin, where he is confined pursuant to a judgment on a verdict finding him guilty of murder of the first degree.
 At 2:06 P. M., on July 22, 1916, a devastating crime was committed in the city of San Francisco. At that moment a dynamite bomb, concealed in a suitcase and detonated by means of a clockwork device, was exploded at Steuart and Market Streets, in the midst of numerous persons who either were watching or about to participate in a planned and publicized preparedness day parade. As a result of the explosion, *9 ten persons were killed and forty or fifty other persons received serious bodily injuries.
 Several days later, Thomas J. Mooney, the petitioner herein, Rena Mooney, his wife, Warren K. Billings, Edward Nolan and Israel Weinberg were arrested and, on August 2, 1916, jointly indicted for the murder of Hetta Knapp, one of the victims of the explosion. Seven other joint indictments, one for the death of each of the other victims who had then died, were also returned against the group. Billings was tried first, on the Knapp indictment, was convicted and sentenced to life imprisonment. His conviction was affirmed on appeal. (People v. Billings, 34 Cal.App. 549 [168 P. 396].) According to the testimony herein of the deputy district attorney who prosecuted Billings, the death penalty was not asked by the prosecution in his case, for it was determined by the prosecuting officials that Billings was a mere tool who did the bidding of Mooney, the petitioner in this proceeding.
 Mooney was the second of the group to be tried. He likewise went to trial on the Knapp indictment. At the conclusion of thirteen trial days, during which one hundred and fifty-four witnesses were examined, the jury returned a verdict finding petitioner guilty of murder of the first degree, without recommendation. A motion for new trial was thereafter denied. Petitioner was accordingly sentenced to be hanged. Subsequently, and on November 29, 1918, and following intervention by President Wilson, his sentence was commuted to life imprisonment. From that sentence he seeks his discharge in this proceeding.
 Merely to complete the record as to the disposition of the other charges filed against the group, it should be pointed out that the later and separate trials of Rena Mooney and Weinberg resulted in their acquittal. The charge against Nolan was ultimately dismissed. The additional charges against petitioner growing out of the other deaths caused by the bomb explosion were all dismissed, except one. Said remaining indictment was permitted to remain dormant on the files until the year 1933, at which time petitioner demanded to be tried thereon. The then district attorney refused and failed to produce any evidence in support of said indictment and the trial court directed a verdict of not guilty thereon.
 As will presently appear from the chronological court history of the Mooney case, certain of the foundational matters *10 upon which the present application is grounded are not of recent discovery or proclamation. The charge of "frameup", now so vigorously urged by petitioner, even antedated petitioner's trial and the production in court of any evidence against him. Subsequent to his arrest and prior to his trial, this charge was voiced through the publication and circulation of a pamphlet entitled "The Frameup System". One needs only to examine the voluminous record in this proceeding to conclude that underlying the Mooney defense from its inception, has been a determined and vigorous campaign of propaganda and vilification directed with all its force against the state and its witnesses in an effort to accomplish the release of petitioner. The purpose of such a prolonged and determined campaign finds eloquent expression in many letters and documents written and received by petitioner and his associates over the years, and which have been placed in the record in this proceeding. The purpose is concededly "public agitation to change the psychology of the people", regardless of the guilt or innocence of the petitioner.
 We now briefly narrate the court history of the Mooney case. Following Mooney's conviction and pending the determination of his appeal from the judgment imposing the extreme penalty, which sentence had not then been commuted to life imprisonment, the attorney-general, on July 30, 1917, filed in this court, a stipulation consenting to a reversal of the judgment of conviction. He was motivated to pursue this course by reason of the publication of certain letters written by one Frank C. Oxman, who subsequent to the writing of the letters, had appeared as a prosecution witness upon the petitioner's trial. At a later point in this opinion we shall have more to say about the witness Oxman. In disposing of the point raised by the attorney-general's consent to a reversal, we pointed out (People v. Mooney, 175 Cal. 666 [166 P. 999]) that the action of that officer was not based upon any claim or assumption that the record on appeal disclosed cause for a reversal, but was "prompted by matters outside the record, disclosed after the proceedings were terminated in the trial court, which led him to believe that justice would be subserved by a retrial of the cause". This court thereupon declared that "in view of the novelty of the suggestion of the attorney-general, and the serious question as to the right of this court under the provisions of our *11 Constitution to grant a new trial except for error in the proceedings in the trial court, we will not consider the question of the advisability of the action suggested by the attorney general's consent, except on formal application or motion by one of the parties addressed to the court, on notice to the other parties interested, including the district attorney of the City and County of San Francisco".
 Thereafter, the petitioner, while his appeal from the judgment was still pending, addressed a motion to this court requesting that the judgment and order be reversed "solely on the ground that the attorney general of the state has filed ... a stipulation and consent that, for reasons stated therein, such action should be had by this court, and that defendant joins in said stipulation". The motion was opposed by the district attorney and denied by this court. In the opinion filed September 11, 1917 (People v. Mooney, 176 Cal. 105 [167 P. 696]), it was declared, in substance, that the only jurisdiction then possessed by the court under the Constitution was to determine whether there had been any error of law in the proceedings in the trial court, the determination of which, it was pointed out, had to be based solely upon a consideration of the transcript of the record in that court.
 Subsequently, and on March 1, 1918, and after a consideration of said transcript, a decision was rendered on the merits which affirmed the judgment of conviction and the order denying petitioner a new trial. (People v. Mooney, 177 Cal. 642 [171 P. 690].)
 Orderly consideration of the issues in this proceeding suggests that we presently defer any discussion of the evidence upon which the jury found its verdict of guilty and which upon appeal was held to be sufficient to support the same.
 In the month following this court's affirmance of the judgment of conviction, i. e., in April, 1918, petitioner moved the trial court to set aside the judgment and sentence on the ground that the verdict of the jury, the judgment, the order denying a new trial and the sentence were "procured through the willful nonfeasance, malfeasance and willful fraud of the district attorney and his assistants who conducted the prosecution ... whereby defendant was deprived of a fair and impartial trial and which prevented a fair submission of the cause". The motion was denied and an appeal was taken. Pending said appeal, the petitioner sought from *12 this court a certificate of probable cause to stay the execution of his sentence which at the time had not been commuted. In the opinion denying such certificate (People v. Mooney, 178 Cal. 525 [174 P. 325]), this court had occasion to refer to the "vague and unsatisfactory" affidavits filed by petitioner in connection with his motion to vacate wherein he had charged that the district attorney and his deputies prior to petitioner's trial possessed certain information, assertedly unknown to petitioner at the time of trial, which it was charged seriously undermined the credibility of two of the prosecution witnesses (Oxman and Mellie Edeau, to each of whom more detailed reference shall hereinafter be made) and which information it was averred seriously challenged the truthfulness of their testimony. The opinion went on to declare that the "showing of fraud or misconduct on the part of the district attorney and his assistants in conducting the trial is of the weakest character, even if he were under any duty or obligation to disclose to the defendant all the evidence within his knowledge relating to the case". However, this was not the only ground of the decision upon that occasion. In addition to the foregoing, this court also adopted the opinion of the trial judge where, in denying the motion to vacate the judgment, he declared that the motion under the circumstances then presented was the equivalent of an application for the common law writ of coram nobis, the office of which writ is abridged, it was held, when statutory remedies exist of a character which had been available to petitioner, viz., motion for new trial and appeal.
 In Mooney v. People, 248 U.S. 579 [39 S.Ct. 21, 63 L.Ed. 430], decided November 18, 1918, the United States Supreme Court denied certiorari to review the last cited decision of this court.
 In 1921, the petitioner applied to the United States District Court for a writ of audita querela on the ground that his conviction was the result of a conspiracy on the part of the prosecuting officials. In support thereof he set out the Oxman letters above mentioned and an affidavit of John MacDonald, dated February 7, 1921, as asserted evidence of the alleged perjury of those persons upon his trial, both of which matters shall hereinafter receive more detailed attention. The United States District Court denied the application *13 on the ground that the writ was not available under California law.
 Thereafter an application for a writ of habeas corpus was filed by petitioner with the United States District Court based on the production of assertedly perjured evidence upon his trial and the alleged suppression by the district attorney of evidence averred to have been material to the defense. The writ was denied. An appeal to the United States Circuit Court of Appeals was denied and the latter tribunal (In re Mooney, 72 Fed.2d 503, decided July 24, 1934) in denying a petition for probable cause and for an appeal, quoted extensively from the last cited decision of this court. Reference was also made to the denial of certiorari therein by the United States Supreme Court.
 Three months later (October, 1934) the petitioner sought leave to file an application for a writ of habeas corpus with the United States Supreme Court, which proceeding was the forerunner of and ultimately proved to be the direct cause for the institution of the present proceeding in this court for a similar writ. In his application to the United States Supreme Court the petitioner alleged that his conviction was brought about solely by perjured testimony, knowingly used by the prosecuting authorities in order to obtain that conviction, coupled with the alleged deliberate suppression of evidence which assertedly would have impeached and refuted the testimony thus given against him. The attorney-general of this state, representing the respondent warden in that proceeding, and by way of return, demurred to the application on which the order had been issued therein directing the warden to show cause why leave to file the application for a writ of habeas corpus should not be granted. Upon well established rules of pleading the demurrer admitted, for the purposes of the proceeding on said return, the truth of the allegations of the application. It therefore appears to have been the theory of the attorney-general that even if those allegations were true, still the petitioner was without remedy in the Supreme Court of the United States under prior decisions of the state and federal courts. In other words, it was his theory, based on said prior decisions, that the requirements of due process had been satisfied upon petitioner's trial in that he had received notice thereof and had a hearing thereon, with full opportunity to defend on all the issues, *14 and that the alleged acts of the prosecuting authorities, even if established, would not have served to destroy the requirements of due process.
 The admission by demurrer, of the charges so made by petitioner, without doubt had a controlling influence on the action of the Supreme Court of the United States in that proceeding wherein, on January 21, 1935, that court, in rejecting the attorney-general's "narrow view of the requirement of due process", declared (Mooney v. Holohan, 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406]) that "It [meaning due process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation. ..." The court, in its opinion, then states that it is not satisfied that California "has failed to provide such corrective judicial process", that "we do not find that petitioner has applied to the state court for a writ of habeas corpus upon the grounds stated in his petition here" and that "we are not at liberty to assume that the State has denied to its court jurisdiction to redress the prohibited wrong upon a proper showing and in an appropriate proceeding for that purpose". (Italics added.) Leave to file the application for habeas corpus was thereupon denied, without prejudice, in order to permit recourse by petitioner "to whatever judicial remedy afforded by the State may still remain open".
 Shortly thereafter, and following the indicated course, petitioner again directed his attention to the state courts and filed an application for a writ of habeas corpus with the District Court of Appeal of the First Appellate District. In an opinion filed on May 14, 1935, in In re Mooney, 6 Cal.App.2d 730 [45 PaCal.2d 388], a majority of the members of division one of that court denied said application. On May 31, 1935, petitioner filed the present application for a writ of habeas corpus with this court. *15
 [1] According to the recent decision of the United States Supreme Court in this matter, supra, it is incumbent upon petitioner in this proceeding, if he is to accomplish his release, that he establish by a preponderance of substantial credible evidence not only that perjured testimony was adduced upon his trial, but also, if such be the fact, that it was knowingly produced by the prosecuting officials. Proof of both elements, perjury and knowledge, by a preponderance of credible evidence, is indispensable under that decision. It was recently so construed by the Supreme Court of Florida in Skipper v. Schumacher, 124 Fla. 384 [169 So. 58, 62-64], and certiorari was denied by the United States Supreme Court (299 U.S. 507 [57 S.Ct. 39, 81 L.Ed. 376].)
 Therefore, proof of perjury alone, without satisfactory substantial proof of knowledge thereof or connivance therein by the prosecuting officials, can avail the petitioner nothing in this proceeding but would relegate him to the executive department. In passing, it may here be mentioned that he has made an application for executive clemency to each of four governors of this state, all of whom, upon independent consideration of petitioner's charges, denied a pardon to him.
 We shall consider the charge of suppression of material evidence in so far as it ties in with or constitutes a part of the alleged frame-up in furtherance of which it is claimed that perjured testimony was knowingly produced by the prosecution.
 [2] As stated above, the present proceeding was commenced on May 31, 1935, by the filing with this court of an application for a writ of habeas corpus. Shortly thereafter, a writ was issued and made returnable before this court at a designated time. Certain preliminary points were disposed of and on August 5, 1935, A. E. Shaw, Esq., a member of the San Francisco bar, was duly appointed to act as referee in the matter for the purpose of taking evidence.
 It is not uncommon to order a reference in habeas corpus proceedings when disputed questions of fact exist. (In re McCoy, 10 Cal.App. 116 [101 P. 419]; In re Matusow, 129 Cal.App. 76 [18 PaCal.2d 72]; Ex parte Eagan, 18 Fla. 194; United States v. Corsi, 55 Fed.2d 360; Cooke v. *16 Cooke, 67 Utah, 371 [248 P. 83, 84]; In re Meyer, 146 App. Div. 626 [131 N.Y. Supp. 380].)
 The order appointing the referee defined the issues to which the evidence was to be directed, as follows:
 "1. Did any witness who testified against Thomas J. Mooney in the trial which led to his conviction on the charge for which he is now deprived of his liberty, commit perjury as defined in Section 118 of the Penal Code of the State of California, that is, did such witness testify to any material matter which he knew to be false?"
 "2. In the event that such witness or witnesses did commit perjury, as so defined, did the representatives of the State of California, the District Attorney or any of his deputies or assistants cause or suffer such testimony to be introduced knowing that such testimony as given was perjured?"
 "3. Did the District Attorney or any of his staff charged with the prosecution of Thomas J. Mooney deliberately, wilfully, knowingly or at all suppress or prevent the introduction of any evidence which, had it been given, would have been favorable to the defense of said Thomas J. Mooney?"
 It was provided by court order that the body of petitioner, in custody of the sheriff, be produced at hearings before the referee. In the interest of orderly procedure, and to insure to petitioner a full hearing and a complete record for the consideration of this court, the practice was adopted, pursuant to court order, of permitting the parties to put into the record, by way of an offer of proof, all testimony or other evidence to which objection might be sustained by the referee. This was in addition, of course, to all other properly admitted evidence. The hearings before the referee were for the most part held in the city and county of San Francisco. Hearings were also held in various cities throughout the United States, the place being determined solely by the residence or convenience of witnesses. Said hearings commenced on August 12, 1935, and extended to August 31, 1936, a period of approximately one year, during which time a record consisting of twenty volumes, containing 13,416 pages of evidence or proffered evidence and hundreds of exhibits, was made up. On August 5, 1936, the referee was directed to prepare and file his findings of fact, based upon the evidence adduced before him. His report and findings were filed herein on January 28, 1937. All material issues were resolved against *17 the petitioner by the referee. On March 12, 1937, the petitioner filed his exceptions to the report and findings of the referee.
 Before undertaking to narrate the evidence adduced by the prosecution upon petitioner's trial and prior to a consideration of his present attack thereon, we deem it pertinent here to state that in our examination and consideration of this cause we have disregarded the "Report and Findings of Fact of the Referee" on the issues involved. We have done so, not because of any dissatisfaction with the conclusions of the referee, but for the reason that both petitioner's and the attorney-general's proposed findings differ materially from those of the referee, and we have reached our determination of the cause upon our own examination of the record. Our findings and conclusions will be developed and disclosed as this opinion progresses. With the way so cleared by this chronological history of the case, we now address ourselves to the evidence upon which petitioner's guilt was determined and his present effort to avoid its consequences.
 [3] We direct our attention first to the testimony of John MacDonald, given upon the trial of petitioner. MacDonald, then an itinerant waiter and seller of newspapers, testified, in substance, that he arrived on the southeast corner of Steuart and Market Streets at "about 1:40" on the afternoon of July 22, 1916, the day of the explosion; that while standing on Steuart Street about 12 or 15 feet from Market Street, he saw a man, identified by him before the trial as Billings, walking from the direction of Mission Street toward Market Street on the west side of Steuart Street; that Billings was carrying a suitcase which he set down near the building line on the sidewalk near the southwest corner of Steuart and Market Streets; that Billings appeared "excited" and his head "was working on a pivot"; that after depositing the suitcase Billings walked to the corner and to the door of a saloon; that almost immediately another man, whom the witness subsequently and also prior to the trial identified as Mooney, the petitioner herein, came out and joined Billings; that they talked, looked at the petitioner's watch and toward the Ferry Building and departed, separately, through the crowd and were lost to the sight of the witness; that the witness shortly thereafter left the vicinity and walked slowly down Market Street toward the Embarcadero; and that when *18 he had walked approximately 150 feet he heard the report of an explosion. Other evidence established the time of the explosion as 2:06 P. M. The witness MacDonald also testified on the trial that he "estimated" it was about five minutes after he (the witness) arrived at Steuart and Market Streets that he first saw Billings (computation reveals this to be at approximately 1:45 P. M.) and that he did not know the exact time Billings set the suitcase down. He was "positive" that Mooney was the man who came out of the saloon and joined Billings.
 On cross-examination, defense counsel attempted to make much of an asserted change of time in the testimony of the witness given upon the prior Billings trial and upon petitioner's trial. Inasmuch as a similar contention is here advanced and the alleged discrepancy in time is charged to and asserted to be the product of improper suggestion by deputy district attorney Cunha, who prosecuted Mooney, we shall pause at this point to consider the contention.
 Upon the Billings trial, MacDonald testified, as to the matter of time, that he saw Billings "as near as can remember 8 or 10 minutes to 2" and that it "must have been about two o'clock" when he set the suitcase on the sidewalk. We perceive no great variation in the story of the witness as regards the fixing of the time of the events narrated by him. In each instance, and upon each trial, it is apparent that the witness was not attempting definitely to fix the exact time of the occurrence of the events. MacDonald was merely estimating and approximating the time of the occurrences described by him. His testimony upon the Billings and Mooney trials is susceptible of no other construction. This is likewise true of his testimony upon the subsequent trials of Rena Mooney and Weinberg (also introduced into this record) where, in effect, he testified he (the witness) arrived at Steuart and Market Streets between "1:30 and 1:40" and that he saw Billings "about" five minutes later. We are of the opinion that no material variation appears in the testimony of the witness upon the several trials that would warrant any claim of corruption against the witness or the prosecuting authorities. Moreover, in asserting that a discrepancy exists in the time element between the testimony of MacDonald upon the Billings and upon the Mooney trials, and in charging the same to the prosecuting officials as part of an avowed attempt *19 on their part to reconcile the time fixed by the witness in the latter trial with the defense of the petitioner which, if accepted, placed him several blocks distant from the scene of the explosion at or about the time the testimony of the witness MacDonald placed him at Steuart and Market Streets, petitioner has overlooked the fact that as regards the time element the testimony of the witness upon petitioner's trial is consistent with and the same as that given by him before the grand jury that indicted petitioner and his co-defendants, which testimony before the grand jury was given prior to the trials of any of the indicted persons and at a time when it was not necessary for the prosecution to "meet" what was then an undisclosed defense. Before the grand jury, the witness testified that he arrived at Steuart and Market Streets "about twenty minutes of two" and shortly thereafter saw Billings and Mooney conducting themselves substantially as already set forth. The time so fixed by the witness on that occasion is identical with the time specified by the witness upon the Mooney trial and definitely destroys petitioner's charge of collusion and corruption in the matter between the Billings trial and the trial of petitioner. Nor, for the same reason, may it successfully be urged that an asserted change of time in MacDonald's story was fabricated in the interim between the two trials in an effort to make it consistent with the testimony of the witness Oxman, to which testimony reference will later be made. This follows from the fact that upon the occasion of MacDonald testifying before the grand jury and fixing the time of the events observed by him at Steuart and Market Streets substantially identical with the time designated therefor in his testimony upon petitioner's trial, the testimony of the witness Oxman constituted no part of the prosecution's case for the reason that he had not then been located. In fact, Oxman had not been located at the time of the Billings trial and he did not appear as a witness at that trial. In addition to what has been said upon the time element, we have the positive testimony of the prosecuting officials denying that they requested the witness to or had him change the time of the events described by him. They likewise denied any and all other claimed improper conduct with reference to this witness.
 [4] We turn now to other matters which the petitioner asserts challenge the credibility of the testimony of the witness *20 MacDonald, as given upon the trial. On February 7, 1921, approximately four years after petitioner's trial and conviction, MacDonald executed what may be termed an affidavit of repudiation. In the petition herein it is alleged that at that time MacDonald voluntarily called at the New York office of one of petitioner's present counsel and after stating that he had perjured himself upon petitioner's trial pursuant to asserted coaching given to him by the district attorney's office, then and there executed the affidavit which since its execution in 1921 has constituted one of the principal props supporting petitioner's case. Subsequent developments tend to indicate that MacDonald's "voluntary" decision to purge himself was induced or at least influenced by circumstances that cast suspicion thereon. By this statement no reflection is intended upon counsel. We shall presently and specifically clarify the point. Later developments, as will be shown, likewise challenge the truthfulness of such attempted repudiation.
 Sight should not be lost of the fact that in his affidavit, and up to the present moment, MacDonald has never retracted his testimony that he was in the vicinity of Steuart and Market Streets on the day of the explosion and observed two men, one with a suitcase, acting in the manner described by him at the trial. His belated repudiation relates solely to the exact time then fixed by him for such occurrences, and to his identification of Mooney and Billings as the individuals then observed by him. He avers that he was induced to falsify his testimony and perjure himself in these particulars under the guidance and instruction of the district attorney, his assistants and certain police officials. MacDonald repeated this repudiation of his testimony in the respects just mentioned in a later affidavit, bearing date July 12, 1930, wherein, among other things, he reaffirmed the 1921 affidavit. In his 1930 testimony before the members of this court, sitting as a commission, In the Matter of the Application of Warren K. Billings for a Pardon (210 Cal. 669 [298 P. 1071]) he also assumed to retract certain portions of his testimony given at petitioner's trial, particularly having to do with the time element and the identification of Mooney and Billings. Again, upon the present proceeding, when called as a witness by the petitioner, he reiterated his repudiation of the indicated portions of his trial testimony and testified that the falsity therein *21 was induced by the prosecution. Being confronted with the fact that he had testified under oath in substantially the same manner upon five occasions (before the grand jury and at four trials) and had substantially reaffirmed his testimony in a letter, to be mentioned shortly, MacDonald at the 1930 hearing before the members of this court could assign no reason why his affidavit of repudiation or his testimony at that hearing should be accepted and believed in preference to his testimony given at the trials. He also conceded while on the stand in the present hearing that he could not expect any court, under all of the circumstances, to attach any credibility to his attempted repudiation. It is significant to note that less than a month prior to the execution by MacDonald of his first affidavit of repudiation, he addressed an unsolicited letter on January 11, 1921, to Duncan Matheson, wherein, among other things, he wrote: "What is all the fuss about Mooney again ... I will say if I was on my death bed and the last words from me, would be that he is guilty, and that what I swore to was nothing but the truth, and I am willing to take the stand tomorrow and swear to the same things." Duncan Matheson, the addressee of MacDonald's letter, is now Treasurer of the City and County of San Francisco. He was formerly a captain of police and immediately after the bomb explosion was placed in charge of the so-called Bomb Bureau created to investigate the crime and track down the perpetrators thereof.
 It is inconceivable that MacDonald could write an unsolicited letter to Matheson unqualifiedly affirming the truthfulness of his trial testimony and then, less than a month later, make an uninduced confession of perjury. An explanation for such a complete and radical change of attitude is to be found in certain events that preceded the execution of the first affidavit of repudiation. The explanation, in our opinion, is to be found in the testimony of Edward N. Nockels, given before the members of this court in 1930. His testimony was read into this record pursuant to agreement, and in order to serve the convenience of Nockels and thus not require him to be present at the hearings held herein before the referee in Grayville, Illinois. The testimony of Nockels, so read into the record, discloses that he was then the Secretary of the Chicago Federation of Labor and had been for twenty-seven years; that after the Mooney trial his organization sent out *22 over the country pictures of the witness MacDonald in an effort to locate him; that MacDonald was located in Trenton, New Jersey, whereupon the Chicago Federation of Labor in January, 1921, sent one Jack Johnston there to observe MacDonald (the latter has always referred to Johnston as Thompson, the only name he claims to have ever known him by); that Johnston remained in Trenton for several weeks and roomed in the same place as MacDonald; that Johnston ultimately communicated with the witness (Nockels) and informed him MacDonald had confessed that he committed perjury upon petitioner's trial; that MacDonald was brought to New York and, as already indicated, executed the 1921 affidavit of repudiation. The witness admitted that his organization thereupon paid Johnston and MacDonald each five hundred dollars and financed a trip for both to California and return, including transportation, compartment and expenses en route. After arriving here, MacDonald failed to testify before the grand jury, undoubtedly the purpose for which the trip was undertaken. Nockels also testified he did not know who paid the expenses of MacDonald's 1930 trip to California when he testified at the Billings hearing and Nockels volunteered the statement that in the absence of other arrangements his organization again would have furnished them.
 Since the execution of the 1921 affidavit of repudiation, MacDonald's statements have been a sequence of inconsistencies, contradictions and obvious falsehoods. The members of this court so stated in a report to the Governor, supra, filed in 1930 in connection with the Billings application for a pardon. Since his first repudiation he has been a vacillating and inconsistent witness who has repeatedly contradicted himself in the expression of a series of patent falsehoods uttered in a vain and abortive effort to retract and repudiate his trial testimony, given at a time when he was free of the influences and forces which over the years have fastened themselves upon him.
 His testimony in this proceeding is as unsatisfactory and as patently perjured as his 1930 testimony upon the Billings pardon application. While on the stand in this proceeding as a witness for the petitioner, MacDonald testified on direct examination that he did not see Mooney or Billings at Steuart and Market Streets or any other place on the day of *23 the explosion; that he testified falsely before the grand jury and upon each of four trials when he said he had seen them at that place; that he could not have identified them had Captain of Police Goff, then assigned to the Bomb Bureau, not pointed out their pictures in a book and said they were the "__________ they wanted"; that the first time he ever saw Mooney or Billings was several days later and while they were in jail; that upon that occasion he, in company with Goff, went to see Mooney in jail and the three of them spoke (this was contradicted by the petitioner himself while on the stand herein when he testified that nothing was said at the time by anyone); that Goff thereupon took him to the Bomb Bureau and in the presence of district attorney Fickert and others said, "he identified him" (singularly enough, the witness does not recall what he then replied, though he purports to detail other portions of the conversation); that the following day he was taken by Goff and the district attorney to see Billings at the Park Police Station; that he was told by Goff that the man he saw was Billings though he could not recognize or identify him; that Goff then told the district attorney, who had remained outside the building in an automobile, that the witness had identified Billings; that prior to the grand jury session and the trials the district attorney and his deputy Cunha told him that Mooney and Billings were the persons they wanted and to swear they were the two he had seen at Steuart and Market Streets; that in the interim between the Billings and Mooney trials Cunha told him to change the time (a matter already discussed) though, almost in the next breath, he testified that "I do not really think that anybody suggested to me that I change the time as to when I saw the suitcase put down, from about 2 o'clock to about 1:45"; that he refused to testify upon the later Weinberg trial, as assertedly requested by Cunha, that he had seen an automobile at the scene of the explosion (this, apparently to cause his testimony to conform in this particular with that of the witness Oxman who testified upon petitioner's trial); that he refused to so testify because "I just made up my mind then that I wasn't going to swear that I did see an automobile there because there wasn't any automobile there." We pause here to state that this is a fair indication that the witness testified truthfully upon the several trials for if he refused to "cooperate" to the extent of testifying *24 falsely as to the presence of an automobile at the scene of the explosion because he had not seen such a vehicle there, it is inconceivable that, merely because requested, he would testify falsely as to the identity of the persons he had seen there when in all probability such identification might lead to their execution.
 Cross-examination of MacDonald herein resulted in the witness entangling himself in a series of contradictions which cast serious doubt upon his present testimony and leads to the conclusion that he is now corruptly attempting to undermine and destroy his trial testimony. During the course of such cross-examination, MacDonald again narrated the events he had witnessed at Steuart and Market Streets. Again, he fixed the time of his arrival there as approximately 1:40 P. M., which is consistent with his testimony given before the grand jury and at the Mooney trial. He testified herein that at the time of his arrival at Steuart and Market Streets, one short block west of the starting point of the parade, the parade had not started, an incident that would impress itself upon a witness and tend definitely to determine the time element. Other evidence fixed the commencement of the parade at 1:30 P. M. which tends to indicate that MacDonald must have been at Steuart and Market Streets at about that time.
 In his effort to establish in this proceeding that he falsified his testimony upon petitioner's trial as to the time element, the witness in apparent confusion contradicted himself several times. This matter is again referred to merely as furnishing a reason for rejecting his present testimony as unreliable. Finally, he testified that while Cunha requested him to change the time he failed to do his bidding. Obviously, this contradicts the averment in his 1921 affidavit wherein he stated that he had changed the time at the insistence of Cunha. As a matter of fact, the witness here testified that the averment of his affidavit was false in this respect. Yet, immediately following, and in almost consecutive sentences, he contradicted himself and testified herein, first, that he did change his testimony as to time at Cunha's request and, then, that he did not.
 Another contradiction in the testimony of the witness herein appears when on one occasion he testified that Goff did not show him the book containing the pictures of Billings *25 and Mooney on the day that he made a statement to the police (to be referred to later) and on another occasion he testified that both events transpired on the same day.
 [5] In the course of his direct examination, the witness testified that he received five or ten dollars at a time from the prosecution and that while waiting to testify at the several trials he was sent to a ranch for several weeks where he was paid three dolars a day. On cross-examination he stated that he was not offered or paid any money by the prosecution. As some explanation for his presence on a ranch, he admitted on cross-examination that prior to his going there red pepper had been thrown in his eyes as he walked in front of the Sutter Hotel in San Francisco and also that he had received letters threatening his life. This would appear to furnish ample reason for the prosecution to remove its witness to a ranch or any other place of safety.
 The story told by MacDonald herein as to his association and connection with the mysterious Johnston (alias Thompson) and Nockels is too absurd and fantastic to commend it to serious consideration. He admitted having lived in the same hotel with Johnston and talking with him about baseball and sundry other subjects, to the exclusion of the Mooney case. In view of the explanation given by Nockels as to Johnston's mission at the time, MacDonald's statements are not entitled to any credence. In fact, as already shown, Nockels testified that Johnston had communicated with him and said that MacDonald had confessed perjury upon the trial. This is in utter conflict with MacDonald's testimony herein. MacDonald also testified herein that he went to New York with Johnston, paying his own expenses, and was there introduced in a saloon by Johnston to Nockels, at which time they talked for several hours without any mention being made of the Mooney case. On cross-examination he admitted this testimony was in conflict with that given by him at the Billings hearing in 1930 wherein he testified: "We talked it over in there and he (Nockels) said, 'Let's go up and see Mr. Cochran' and I said 'Yes'. So then we found out Mr. Cochran was sick and he says 'We will go up and see Frank Walsh tomorrow morning'." This prolonged silence as to the Mooney case continued, according to MacDonald's story herein, up to the moment he appeared in the office of Mr. Walsh, one of petitioner's present counsel, where he had gone *26 at Johnston's suggestion, for some apparently undisclosed purpose. While in said office he executed the 1921 affidavit upon which petitioner relies. In explanation thereof, he testified "I guess Johnston told Walsh that I was willing to repudiate my testimony". In the light of MacDonald's earlier testimony in this proceeding that he and Johnston had not discussed the Mooney case, one necessarily pauses to inquire from whence did Johnston receive the information that MacDonald was ready to repudiate his trial testimony. Realizing the absurdity of his story, and in an apparent endeavor to bolster obvious weakness therein, MacDonald then went on to testify in this proceeding that he did "not know how Johnston knew that, but guess that Johnston must have read it or seen it in the paper" and this, apparently prior to any public repudiation of his testimony by MacDonald.
 Another illustration of the present unreliability of MacDonald is found in the fact that he here testified that when he went to New York in 1921 he had no intention or idea of making a confession or an affidavit of repudiation, while at the same time he admitted testifying at the Billings hearing in 1930 that he "went to New York to make a confession to Mr. Cochrane".
 There are other circumstances which illustrate material variations in MacDonald's attempted repudiation of his testimony and which prove beyond question that his testimony given in repudiation of his trial testimony is corruptly false and untrue. Among them are the many contradictions found in his testimony given before Lieutenant-Governor Carnahan a few days following his testimony in 1930. His testimony on that occasion, made a part of this record by petitioner, is not only self-contradictory in many particulars but likewise runs counter to his earlier testimony at the Billings hearing. A similar circumstance is presented by the testimony of David Murphy, a retired police sergeant, who testified that he met MacDonald in 1920 in Baltimore at which time MacDonald requested the witness to inform Captain Matheson that while there was some talk about his changing or repudiating his testimony, he would not do so but would again testify, if necessary, in the same manner as upon the trials.
 The unsatisfactory and highly contradictory testimony of MacDonald upon this proceeding causes us to affirm our *27 appraisal of him as expressed in the report filed in connection with the recent Billings application for a pardon, supra. We there declared, in part: "However much MacDonald may have sought to discredit himself and his former testimony by the making of such an affidavit, we are satisfied that placing his two conflicting statements together and considering each in the light of the circumstances under which it was made, the original testimony of John MacDonald as given with so much of circumstance and detail upon the trials of each of these men, within a short time after the occurrence of the tragedy for the causation of which they were being tried, bears the stamp of truth, while, on the other hand, this belated affidavit, wherein he undertakes with so much of intermingled untruth to cast discredit upon his former testimony bears the stamp of falsity, and that the substance and effect of this affiant's former positive and damning identification of both of these men as the perpetrators of this foul crime has not been thereby overthrown."
 Having in mind all of the circumstances and particularly the many contradictions in MacDonald's testimony given in this proceeding, we may well sum up the matter, as did Mr. Justice Richards upon the Billings second hearing, by declaring "as our deliberate conclusion that the effect upon our minds of the production of John MacDonald as a witness before us has been but to reinforce our former conclusion that his attempted repudiation of the testimony which he gave before the court and jury in the Billings and succeeding cases was so abundantly shown to be false, if not, as we believe, corruptly inspired, as to be utterly valueless for that purpose, and hence that the testimony of John MacDonald as given upon the Billings trial in 1916 [and the following trials, including petitioner's] and the truth thereof have not been successfully assailed or overthrown. ..."
 In addition to the matters already referred to as lending credence to MacDonald's testimony as given upon the several trials, the following circumstances, fully developed in the record herein, serve also to establish the truthfulness thereof and the falsity of the attempted repudiation. It appears that on the afternoon of July 22, 1916, a short time after the explosion, MacDonald told several persons with whom he casually came in contact that he had seen a man deposit a suitcase at the place of the explosion and prior thereto. In these *28 conversations he described and repeated in detail the appearance and actions of the man and his confederate, substantially as he did upon the later trials. Several of these persons were called as witnesses in this proceeding by the respondent and related their recollection of MacDonald's statements. At the time, MacDonald was advised to convey his information to the police. Accordingly, on the following Monday morning, two days after the explosion, MacDonald went voluntarily to the police department. This accounts for MacDonald's presence in the case and, quite naturally, precludes any charge being made that he was produced by the prosecution in support of an asserted "frame-up". He thereafter told his story to police officials. He identified Mooney and Billings, according to the testimony herein of certain of those officials, from their pictures and their persons. Before the grand jury and upon the four subsequent trials he reiterated his story and positively identified Mooney and Billings as the persons he had observed at the scene of the explosion and acting in the manner described by him. Rigid and searching cross-examination by eminent counsel upon the trials left his story and particularly his identifications unshaken.
 Moreover, at this hearing the district attorney and his deputies, who prosecuted petitioner and Billings, and captains of police Goff and Matheson, took the stand and denied the accusations made by MacDonald in his affidavits and in his subsequent testimony at the Billings hearing and in this proceeding. Captain Goff while on the stand herein testified that he met MacDonald at police headquarters three days after the explosion whereupon MacDonald narrated to him what he had seen and in a manner substantially the same as his testimony upon the trial; that MacDonald also designated the several persons to whom he had related his experiences on the afternoon of the explosion; that MacDonald, without assistance or suggestion, had identified Billings and Mooney from pictures in a book, pointing out in the course of such identification that the picture of Mooney showed him with a mustache which MacDonald said he was not wearing on the day of the explosion, and which was the fact. Thereupon, Goff testified herein, he held a finger over the mustache and MacDonald definitely stated that the picture of Mooney was a picture of the man he had seen at Steuart and Market Streets. Investigation verified MacDonald's statement that *29 he had related his observations almost immediately after the explosion to the several persons named by him. A police report filed by Goff, under date of August 10, 1916, and put in evidence herein, substantiates this portion of Goff's testimony. Goff also testified that neither the district attorney nor any member of his staff, at whom the "frameup" charge is principally directed, was present when MacDonald identified Mooney and Billings from pictures in the "Safe Blowers" book. Contrary to MacDonald's version of the incident, Goff likewise testified herein that when MacDonald was taken to the county jail to see the petitioner, he was permitted to walk along the tiers of cells, alone, and when he found the man he had seen at Steuart and Market Streets, he indicated with a gesture. It was petitioner's cell. Goff denied that he had pointed out Mooney or Billings in their cells, as testified by MacDonald.
 Captain Matheson testified, among other things, that prior to the trials the police department made a thorough check of MacDonald's past history and his name was found to be without blemish. Likewise, that his story stood up under investigation. He was regarded as a very satisfactory witness and Matheson indicated he had no reason to question or doubt his testimony, until the execution of the 1921 affidavit.
 Charles M. Fickert, who as district attorney headed the prosecution of petitioner, when on the stand in this proceeding, denied the charges made against him by MacDonald herein. He testified that MacDonald had identified both Mooney and Billings before he had met him; that his recollection was that he met MacDonald for the first time on August 1, 1916, before the grand jury session; that he never suggested or directed that MacDonald should say that Mooney and Billings were the men he had seen at Steuart and Market Streets; and that after the Billings trial he had sent MacDonald to a ranch because he had been set upon and otherwise harassed upon several occasions.
 Edward A. Cunha, the deputy district attorney who prosecuted petitioner, testified, as regards the witness MacDonald, that before petitioner's trial he went over MacDonald's testimony with him; that he did not suggest any change in time or any other portion of such testimony; that he did not tell MacDonald that Mooney and Billings were the men they *30 wanted; that MacDonald's testimony to that effect is false; and that he did not attempt to have MacDonald testify at the later trials of the other defendants (which trials the witness did not direct) that he had seen an automobile at Steuart and Market Streets.
 We could go on at greater length narrating other matters and circumstances, of which the record is replete, establishing the falsity of MacDonald's attempted repudiation of his trial testimony. We are satisfied that sufficient has been said upon the point. We therefore find and conclude that the evidence before us is insufficient to establish that MacDonald gave false testimony upon the trial of the petitioner; that his attempted repudiation of his trial testimony is false; and that the charge that the prosecuting officials were guilty of subornation of perjury in connection with the testimony of the witness MacDonald is without substantial evidence to support it.
 [6] On the same day (July 24, 1916), that MacDonald first reported to the police and related to them what he had seen at Steuart and Market Streets two days earlier, certain written reports were made by police officers McCullough and Hughes of statements made to them by MacDonald. As introduced in evidence here they were pasted together, back to back. These reports, among other things, purport to contain descriptions of the men whom MacDonald had seen at the scene of the explosion. It is conceded by the respondent herein that they are not accurate descriptions of either Mooney or Billings. Based on this, and on the allegation that the existence of these reports was not ascertained by petitioner or his counsel until the 1930 Billings hearing, the petitioner charges herein that these reports were deliberately suppressed or negligently concealed from the defense at the time of the trial. Nowhere in the record is there any showing that the district attorney or his deputies had seen or were aware of the existence of these reports during any of the bomb trials. Petitioner upon his trial was ably represented by competent attorneys, well experienced in criminal practice. In fact, one of his counsel had shortly prior thereto severed his connection with the office of the district attorney wherein he had prosecuted many cases. Properly directed cross-examination, followed by a request or demand upon the prosecution *31 in open court at the time of the trial, undoubtedly would have served to produce the reports now under consideration.
 However, while knowledge of the contents of these reports may have assisted the defense in their cross-examination of MacDonald, we do not attach the significance or materiality to said reports that petitioner does. The description therein merely inaccurately stated the heights, weights and ages of the persons involved. No glaring discrepancy appears. It is a matter of common experience that the power to reproduce a mental picture of an unknown, or even a known, person, sufficiently accurate in every particular to enable ready identification of such person by others, is, in a great majority of cases, quite impossible. The indescribable countenance and physiological characteristics cannot be satisfactorily conveyed to another by words or in writing, except in rare cases. But when the person whose identity is in question is brought again before the identifying witness, the latter may with greater accuracy state whether such person agrees with the mental picture on the mind of the witness. Such is the situation that confronted the prosecution in 1916. In opposition to MacDonald's meager and inaccurate oral descriptions of Mooney and Billings in his statements to officers McCullough and Hughes, there was the subsequent positive and unequivocal identification of those individuals by MacDonald both from their pictures and persons. Under the circumstances, the prosecution might well disregard as immaterial the former verbal statements of the witness. That is exactly what transpired. Captain Matheson, when on the stand as a witness for petitioner, testified that thirty years of police experience had established to his satisfaction that persons usually describe another inaccurately; that an oral description of a person usually "isn't of any great value"; and that after a witness has actually identified a person, as did MacDonald, a prior written statement ceases to have any active effect and no further consideration is given to it. The record discloses that Captain Goff, a police officer of many years experience, shared this view. This would appear to be adequate explanation as to why the McCullough and Hughes reports were permitted to rest as merely two of several hundred reports or exhibits in the police files. Other than the asserted fact that petitioner was without knowledge of the existence of these reports until 1930, the record herein is destitute of any evidence *32 tending to establish their deliberate suppression. We, therefore, find and conclude that at the time of petitioner's trial there was no suppression of material evidence in connection with the testimony of the witness MacDonald.
 In the interim between the Billings and Mooney trials, the prosecution located Frank C. Oxman who appeared as a witness against petitioner. Oxman, who then resided in Durkee, Oregon, and who has since died, testified, in substance, that he was engaged in the cattle business which frequently brought him to San Francisco; that on the day of the explosion he arrived in San Francisco between 12:00 and 1:00 P. M. and shortly thereafter was standing at the southwest corner of Steuart and Market Streets (this would place Oxman on the same side of Steuart Street whereon the explosion occurred and opposite to that side of the street upon which MacDonald stood); that while there he saw an automobile facing toward the ferry and containing Mooney, Rena Mooney, Billings, an unidentified man and Weinberg, the latter driving; that Mooney, while sitting in front and to the right of the driver, was holding a suitcase on the running board; that the automobile stopped, whereupon "the little auburn-haired boy (indicating Billings) jumped out of the hind seat, very excitedly and very rapidly and took the suitcase"; that the second and unidentified man also got out of the rear seat, came on the sidewalk near the witness and took the suitcase from Billings and the two walked down Steuart Street a short distance; that Mooney got out of the automobile and looked after the others; that Billings then took the suitcase from the unidentified man and placed it on the sidewalk against the building; that Billings then came back and joined Mooney; that he thinks "They went in the door of the building there ... I won't be sure whether all of them or not ... and directly came out"; that Mooney and Billings were then talking, the former saying, "Give it to him and let him go; we must get away from here; the bulls will be after us"; that Billings gave something to the unidentified man, who then left; that Billings went toward the automobile; that Mooney looked at his watch and at the ferry clock and proceeded toward the automobile; that the automobile then proceeded into Steuart Street; and that the witness left and arrived at the Terminal Hotel on the north side of Market Street and a little to the west of Steuart Street at about 1:45 *33 P. M., he estimated, because he was expecting a phone call from a Miller & Lux buyer at 2 P. M. On cross-examination of Oxman at the trial it was disclosed that he first told his story in Kansas City to someone who had phoned him and said he represented the district attorney of San Francisco; that he met the party later and told his story in response to questions; that he later got a letter from the district attorney inquiring when someone could be sent to interview him; that Lieutenant Bunner thereafter came to his headquarters at Durkee, Oregon; that he gave him a detailed story of the occurrences he had observed at Steuart and Market Streets. Again, on cross-examination he traced his movements on the day of the explosion, and testified that the automobile referred to on direct examination came along and stopped for about two minutes; that he entertained "no question about the identification" of the persons therein; that as the automobile left he made a note of the license number, whereupon he produced an envelope on which was written "Ford No. 5187, think stolen 'grip' S. F. July 22nd,"; that he wrote the number down because "they trace cattle thieves with the numbers"; that he heard about the explosion the next day but "didn't want to get mixed up in that connection with anybody that throwed a bomb" and "didn't want to come and testify" because he had 5,000 cattle on ranches in Oregon and Idaho requiring his presence; that he later identified Mooney in jail; that Mooney was not pointed out to him; and that he walked by several cells and picked out Mooney in cell No. 29 and wrote that number down, again evincing his characteristic or practice in this respect.
 [7] The foregoing represents the substance and material portions of Oxman's trial testimony. We shall now consider and dispose of petitioner's contention having to do with an asserted inconsistency between it and MacDonald's testimony. This contention is advanced in support of the charge of perjury in the testimony of the two witnesses. The alleged discrepancy is supposed to lie in the fact that MacDonald in narrating what he had seen described only two persons, Mooney and Billings, and made no reference to the presence of an automobile. We perceive no irreconcilable conflict in the testimony of the two witnesses. It should be borne in mind, as already pointed out, that the two witnesses were standing on opposite sides of Steuart Street, which street at *34 the time was more or less crowded or congested with potential parade participants and onlookers. Each witness may well have seen different phases of the same transaction or event. In fact, this reasoning finds support in their testimony. MacDonald may well have noticed or observed, to the exclusion of everything else, that portion of the occurrences described by Oxman from the time Billings took the suitcase from the unidentified person mentioned by Oxman, proceeded to the wall of the building, placed the suitcase there, and then, continuing toward Market Street from the direction of Mission Street on the west side of Steuart Street, met Mooney, whereupon the two emerged from the direction of the saloon door, as mentioned by both witnesses. Both witnesses, it will be recalled, thereupon described Mooney and Billings as talking, looking at a watch and the ferry clock and then leaving separately, Oxman stating that each proceeded "toward" the automobile while MacDonald said they became lost in the crowd.
 We shall not dwell longer on the point. In our opinion, the testimony of the two witnesses is not in irreconcilable conflict. We have discussed the point merely because of its possible bearing upon the charge of frameup and perjury now and heretofore urged. A similar contention was advanced upon petitioner's appeal from the judgment. There, as here, this court concluded that the stories of the two witnesses were not incompatible and that it was well within the bounds of reason that the witnesses saw parts of the same occurrences, but that Oxman, because of his proximity to the happenings, saw more than MacDonald could observe from the place which he occupied on the opposite side of Steuart Street.
 [8] We turn our attention now to the charge that the prosecution upon petitioner's trial suppressed material evidence which would have assisted the defense in their cross-examination of Oxman. This charge bears upon and has reference to Oxman's Kansas City affidavit under date of October 26, 1916. Prior to the execution of said affidavit it appears that the district attorney had received certain information, to be later developed in another connection, of the existence of a witness who ultimately proved to be Oxman. The information was such as to warrant the district attorney employing the services of a nationally known detective agency *35 in an effort to locate said witness. He was found in Kansas City by an operative of that agency and it was then that the much-discussed Kansas City affidavit was executed. The report of an operative, bearing date October 26, 1916, was read into evidence herein and it narrates Oxman's story substantially as he did upon petitioner's trial and this, at a time obviously prior to any possible association between Oxman and the officials here charged. In this Kansas City affidavit Oxman averred that he arrived in San Francisco on the day of the explosion "just before or about noon"; that he proceeded to the Terminal Hotel; that it was crowded, but he was promised a room by the clerk before night; that he left his grip and remained about the lobby for a few minutes; that he was unsuccessful in finding an uncrowded place to eat; that he remained "on the corner of a side street leading out from Washington street to the left, being I think, the first street leading out from the west after leaving Front street"; that he remained on the corner "a few moments, and my attention was called to a jitney--I think a Ford, stopped near me. ... It was driven by a driver, three people in the back seat, two in the front seat, one of which was the driver. One of the five people was a lady. Very soon after the car stopped two gentlemen from the rear seat got out. The second gentleman to get out handed to the first gentleman to get out, a common looking suitcase, being of brown paper or cheap leather. While I was standing on the corner one of the gentlemen carrying the suitcase pushed me to one side. The second gentleman also rubbed up against me. They proceeded on a few feet when the gentleman carrying the suitcase handed it back to the gentleman which had given it to him after they left the automobile. This gentleman proceeded about ten feet and set it down by the side of a brick building. ... They proceeded back and also seemed to be a little frustrated ... I noted them talking in a foreign language. ..." Oxman then went on to aver in his affidavit that pictures of Mooney, Billings and Weinberg satisfied him that they were the men he had seen, Weinberg being the driver and Mooney sitting to his right. The woman was described as wearing "a broad brimmed cheap hat, and had a very prominent and bold face".
 In the main, there is no great deviation between the substance of the averments of the affidavit and the material *36 portions of Oxman's subsequent testimony upon petitioner's trial. As to the persons he had observed, their manner of approach to the scene and their conduct while there, the two are substantially the same. Much is attempted to be made of the improper designation or mis-description of the streets in the affidavit. This is explainable. As we have seen, Oxman lived in another state and was a stranger who came to the city only when business required. It is conceivable, under the circumstances, that he might improperly designate the streets. The testimony of Stephen Bunner, given before the grand jury on certain charges pending against Oxman before that body subsequent to the Mooney trial, discloses that prior to coming to California as a witness, Oxman was interviewed by him in Durkee, Oregon, in November, 1916, the month following execution of the Kansas City affidavit, with a view to ascertaining what he knew of the events under investigation. Bunner testified that in the course of the interview the matter of the misnamed or misdescribed streets in the affidavit came up for discussion, whereupon Oxman took a paper and pencil and sketched what proved to be the Embarcadero, Sacramento, Market and Steuart Streets, thus indicating he was at the scene of the explosion though improperly designated by him in the prior affidavit. Bunner was corroborated in this latter respect by Fickert and Cunha, each of whom, while on the stand in this proceeding, testified that when Bunner returned from his interview with Oxman in Oregon he had with him a diagram assertedly drawn by Oxman. Bunner further testified before the grand jury at that time that Oxman identified pictures of Mooney, Billings, Rena Mooney and Weinberg and expressed a dislike to come to San Francisco and testify because he thought "a man is taking his life in his hands that goes and testifies against any of these people", but indicated he would testify later when necessary. Bunner, a former police captain, is out of the state and could not be located to testify upon this proceeding. His testimony was read into the record by petitioner.
 The fact that Oxman averred in his affidavit that he "noticed them talking in a foreign language", which was not mentioned by him upon the trial, is stressed by petitioner as something worthy of cross-examination if the affidavit had been available or made known to him upon the trial. In *37 response to this contention it might be argued that the "foreign language" may have been uttered by the unidentified man whom Oxman designated as being with the others at the scene of the explosion and, according to Fickert's testimony herein, whom Oxman designated on one occasion in the district attorney's office as "a foreigner". Moreover, said unidentified man may well have been the person described by the witness Crowley upon the Billings trial, as the person he saw with Billings at Steuart and Mission Streets, less than a block from the scene of the explosion, immediately prior thereto and shortly thereafter. He was described by Crowley, who is now dead and whose testimony was likewise read into this record by petitioner, as "either a Spaniard or a Mexican". Such a person may have uttered the "foreign language" referred to in the affidavit of Oxman and it is equally conceivable that he and Billings shortly after the placing of the suitcase abandoned the party, to be seen by Crowley at Steuart and Mission Streets--the others, particularly Mooney and Rena Mooney, thereupon despatching themselves, by the automobile described by Oxman, to other places, including possibly the roof of the Eilers building, where petitioner and his wife assert they were during all the times the prosecution witnesses had them elsewhere.
 This rationalization is offered merely as a possible answer to petitioner's charge of frameup and perjury based on asserted discrepancies in the statements and testimony of the several prosecution witnesses. It is not advanced as proof of the fact that the petitioner and his wife were or were not on the Eilers building roof as contended by them from early afternoon. That defense and issue was fully presented to the jury upon petitioner's trial and was impliedly found to be without merit upon the return of a verdict of guilty.
 However, even in the absence of the foregoing possible reconciliation of portions of Oxman's Kansas City affidavit with his testimony upon petitioner's trial, we cannot accede to the contention that such affidavit was suppressed and concealed upon the trial so as to preclude proper cross- examination of the witness thereon. As we have already shown, upon petitioner's trial and during the cross-examination of Oxman, the defense itself disclosed in open court that he had first told his story in Kansas City in response to questions asked by one who said he represented the district attorney. *38 With this information before them counsel representing petitioner, versed as they were in the practice of criminal law, by the simple expedient of a request or demand for such statement, theretofore admittedly made by the witness, could and would have procured the same for their own use on cross-examination. We therefore find and conclude that petitioner upon his trial had knowledge or information sufficient to charge him with knowledge of the existence of Oxman's Kansas City statement; that the prosecution did not deliberately or improperly conceal the same from petitioner; and that the prosecution did not in this respect suppress evidence material to the defense.
 It should be noted, in passing, that the original Oxman Kansas City affidavit has not been found and was not introduced in evidence in this proceeding. Two documents, purporting to be copies of such affidavit, and found in widely separated places, caused the respondent herein to accept the same as true copies, though no incontrovertible proof of that fact appears in the record. We have proceeded upon the theory that they are copies of said affidavit.
 The attacks upon the witness Oxman and his trial testimony have assumed many and varied forms. The attacks have not always been consistent, except in their objective to prove Oxman a perjurer. In our opinion, this inconsistency in a degree tends to lessen the force and effect of such assaults. As an illustration of the inconsistency of petitioner's attacks upon Oxman's testimony, it may be pointed out that upon motion for new trial, the petitioner filed the so-called LaPosse affidavit wherein the affiant averred that she saw Oxman in San Francisco on the day of the explosion at approximately 2:00 P. M. in front of the Phelan building on Market Street. This point is considerably farther up Market Street than Oxman's testimony upon petitioner's trial placed him at that time. The affiant also averred that she sat silent in the courtroom during the giving of Oxman's alleged false testimony and throughout the trial and until the motion for new trial, without informing defense counsel of the contents of her affidavit. The affidavit appears to be absurd on its face and apparently carried little weight with the trial judge, who denied the motion for new trial. It is mentioned, as stated, merely to illustrate the inconsistency of petitioner's attacks upon Oxman and his testimony for, *39 as will later appear herein, a subsequent assault thereon, contrary to the LaPosse assault, undertakes to establish that Oxman was in another city, many miles away, at the time his testimony, and the LaPosse affidavit filed by petitioner upon motion for new trial, had him in San Francisco.
 [9] An attempt is made to show that Oxman's introduction to the Mooney case was, in common parlance, "shady". This claim rests to some extent upon the testimony of one James A. Tate, 71 years of age, who testified herein on behalf of petitioner that about three or four weeks after the explosion he had a conversation with William F. Woods, a station agent at Durkee, Oregon, and who it will shortly be shown gave the district attorney the information which led to Oxman becoming a witness, in which conversation Woods is asserted to have informed Tate that he had been offered $1,000 by a person (ostensibly Oxman) who wanted him (Woods) to "tip him off" as a witness to the San Francisco authorities. Tate testified further that he advised Woods against such an improper course. Upon motion, the evidence was properly stricken as hearsay but remained in the record herein as an offer of proof and upon promise of counsel to subsequently connect it up. Without waiving his objection thereto, the attorney-general cross-examined the witness. For present purposes we shall disregard the hearsay character of the evidence and consider it for what it is worth. Subsequent developments detract materially from the value of the testimony of the witness and deprive it of all vestige of credibility. On cross-examination the witness testified that he imparted the information to two of defense counsel, naming them, during the Mooney trial, yet it does not appear to have been employed at that time in an effort to discredit Oxman. Tate also testified on cross-examination that he had read the newspapers all during the Billings and Mooney trial and read Oxman's testimony at the latter trial; that he was never asked to make an affidavit or to come to San Francisco and testify upon this matter; and that he knew Mooney was to hang (before commutation of sentence) but made no effort to inform the prosecuting authorities of the information he claimed to have possessed. His testimony in this proceeding comes twenty years after petitioner's conviction and lacks in evidentiary substance. Moreover, Woods, when on the stand herein upon call by the petitioner, denied on cross-examination *40 that he had any such conversation with Tate. He testified further that the correspondence by which he first acquainted the district attorney with knowledge of Oxman's existence, was not the result of prearrangement with Oxman. Under all the circumstances, we find and conclude that the testimony of James A. Tate herein is not worthy of credence.
 Edward E. Lyon, assistant station agent under Woods at Durkee, Oregon, testified that in September, 1916, Oxman advised him he could make "a piece of money" by merely forwarding Oxman's name to the district attorney of San Francisco. This testimony, like that of Tate, the preceding witness, coming as it does more than twenty years after the occurrence, lacks in evidentiary value. This sudden desire to unburden himself, in the face of a prolonged silence when persons were faced with possible execution, places his testimony in an unfavorable light and tends strongly to deprive it of substance and credibility.
 Petitioner also called as a witness upon this proceeding one Oliver O. Baisley who testified that in the latter part of September, 1916, he had overheard a conversation between Oxman and Woods in which the former stated, in substance, that "if this goes through there is $2500 in it for you" and that he then heard Woods read aloud his letter thereafter mailed to the district attorney in which he offered to put the district attorney in touch with a witness for $2,500. This evidence, like the Tate and Lyon testimony, obviously does not connect the district attorney with such asserted improper conduct and necessarily falls short of the burden resting upon petitioner. For this reason, an objection was properly sustained thereto and the same went in merely as an offer of proof. A motion to strike was thereafter properly granted. Without waiving his objection, and merely to assure a complete record, the attorney-general cross-examined the witness. On such cross-examination, it was revealed that the witness overheard the conversation when 12 or 14 feet from the parties. It is inconceivable that persons engaged in so nefarious a scheme would plan the same aloud in a railroad station, as indicated by the witness. On cross-examination the witness admitted that it "dawned" on him in 1917 after the Mooney trial that there was something wrong with the testimony of Oxman upon the trial but he did not desire to mix up in the case and therefore did not mention the matter *41 to the Mooney defense until a week before this proceeding commenced in 1935. While admitting he had not seen a copy of the letter of Woods to the district attorney for nineteen years, the witness recited the contents thereof almost verbatim. These matters, in our opinion, detract materially from the testimony and cause us to conclude that it is not worthy of credence.
 [10] This brings us to a consideration of the introduction of Oxman to the Mooney case and certain interesting and subsequent developments upon which petitioner places much stress in his charge of frameup and perjury. District Attorney Fickert, while on the stand in this proceeding, testified in this connection, in substance, that he first heard of Oxman from one Wotchorst, a former district attorney of Sacramento County, who informed him that he had heard from a friend of a man by the name of Oxman who apparently had indicated that he had observed a suitcase being placed at the scene of the explosion but who was reluctant to become a witness. Fickert testified that he communicated with his informant in an effort to locate the party who had seen the suitcase deposited. However, before receiving any additional information from this lead, Fickert testified he received a letter, which was introduced in evidence, bearing date September 21, 1916, from Woods, the station agent at Durkee, Oregon, referred to above. In that letter, Woods stated that six days after the explosion he had talked with a reputable Oregon business man who said he was in San Francisco and had witnessed the placing of a suitcase near the corner of Steuart and Market Streets and felt he could identify the parties involved in the episode. The letter went on to state that rather than neglect his business the informant decided when in San Francisco not to disclose what he had seen and that he was still of the same view. Woods concluded his letter by saying "if his testimony in this case will be of service to you I will put you in touch with this party for $2500.00 payable upon conviction of the guilty parties".
 On September 23, 1916, the district attorney replied to Woods asking for additional information and descriptions of the persons so that he might ascertain "the correctness of the witness' statement to you ..." Woods' reply to this letter under date of September 27, 1916, could not be found and, based solely upon its absence, and without any definite *42 knowledge of its contents, the petitioner charges suppression of material evidence by the prosecution. This charge is not directed at the attorney-general for his failure to produce the letter upon this hearing but rather at the prosecution officials upon the theory that the letter must have contained damaging information and hence was destroyed. This contention is based solely on surmise and conjecture. When on the stand in this proceeding, Woods answered "Yes" to a query inquiring whether the missing letter detailed what Oxman (then unnamed in the correspondence) had told him. He also testified that his copy of the missing letter had been destroyed several years earlier and that he could not remember all the details thereof. We find and conclude that petitioner's charge of suppression in connection with this letter is based wholly on suspicion and is without substantial evidence to support it.
 The district attorney next addressed a letter to Woods on October 9, 1916, the opening sentence of which states "I received your communication of September 27th". Certainly, if the prosecution deliberately destroyed or concealed Woods' prior letter of September 27th, as assumed by petitioner, because of its implied damaging contents, it seems reasonable to conclude that the district attorney's reply thereto of October 9th, expressly referring to it, likewise would have "disappeared" in order to conceal the fact that the prior missing letter had been written.
 In his letter of October 9, 1916, the district attorney stated to Woods: "In some particulars the information you give corresponds with the evidence given by the witnesses in the trial of the case (this has reference to the Billings trial which had just concluded). Of course, it will be impossible for me to tell what this information might lead to until I have a talk with the man who informed you. We have heard of a man from Oregon by the name of Oxman who has stated that he knew something about the explosion. ... If you would give us the name and address of your informant there would not be likelihood of your getting into trouble on that account, as no good citizen would complain about your taking such action. We would also not reveal the source of the information."
 "In reference to the reward offered for information leading towards the arrest and conviction of the perpetrators of the *43 bomb outrage, I have nothing to do with the disposition of that money. ... I want it positively understood that no witness in the case should under any circumstances receive any part of the reward because I believe it is very bad policy and sometimes would tend to fabricate testimony. ..."
 "If you feel like giving me the name and address of your informant mentioned in your letter, I wish you would send his name, address and employment to me so that I can get into communication with him. Any information you give will be treated as confidential. ..."
 On October 13, 1916, Woods wrote to the district attorney and named "F. C. Oxman, a big cattle owner and buyer of this vicinity", as his informant, and stated that Oxman could be reached at Durkee, Oregon, until October 18th, upon which date he would accompany a shipment of cattle to Chicago. The writer went on to point out that since his first conversation with Oxman they had not discussed the subject and, therefore, assured Fickert that no agreement existed between them regarding division of any reward. In fact, Woods testified herein that because of the district attorney's attitude, as expressed in the above quoted letter, he did not anticipate receiving any portion of the reward money then offered. A series of communications, all introduced in evidence here, subsequently passed between Woods and the district attorney which culminated with telegraphic information from the former to the latter on October 18, 1916, that Oxman was going to Kansas City with his shipment of cattle. It was along about this time that the district attorney engaged the services of a detective agency, as already indicated, in an attempt to locate Oxman as a possible witness. As already shown, he was located at Kansas City and the so-called Kansas City affidavit, hereinbefore discussed, was procured on October 26, 1916. The Bunner interview with Oxman in Durkee, Oregon, also mentioned above, followed shortly thereafter and ultimately Oxman came to San Francisco and appeared as a witness at the trial of petitioner, which trial commenced January 3, 1917. We find nothing in the record that suggests anything savoring of impropriety on the part of the prosecuting officials in producing the witness Oxman in the case.
 [11] Petitioner's trial concluded on February 9, 1917, with the return of the verdict already mentioned. Shortly *44 after the denial of petitioner's motion for a new trial, certain letters addressed by Oxman to Ed. Rigall, Grayville, Illinois, came to light and received wide publicity. These letters are greatly relied upon by petitioner in his effort to establish perjury in the testimony of Oxman. Preliminarily, it is interesting to note that it appears from the testimony herein of one of petitioner's former counsel that before the so-called Oxman-Rigall letters were brought into the light of day, Rigall had demanded $10,000 therefor. By talking all night to Rigall, counsel testified he succeeded in procuring the letters without the payment of any money.
 The first letter from Oxman to Rigall was written approximately three weeks prior to the commencement of petitioner's trial. In it Oxman said: "Dear Ed has been a long time sence I hurd from you I have a chance for you to cum to San Frico as a expurt wittness in a very important case you will only hafto answer 3 & 4 questions and I will Post you on them you will get milegag (mileage) and all that a witness can draw Proply 100 in the cleare so if you will come ans. me quick in Care of this Hotel And I will mange the Balance it is all OK but I need a witness Let me no if you can come Jan 3 is the dait set for trile Please keep this confidential Answer hear Yours Truly F. C. Oxman".
 In response to this, Rigall apparently wired he would come to San Francisco whereupon he received a second letter from Oxman, stating: "Dear Ed Your Telegram Received I will wire you Transportation in Plenty of time allso expce necesry will route you by Chicago Omaha, M. P. Ogden S. P. to San Frico I thought you can make the Trip and see California and save a lettle money As you will be allowed to Collect 10c Per mile from the state which will Be about 200 Besides I can get your Expences and you will only hafto say you seen me on July 22. in San Frisco and that will Be Easy dun I will try and meet you on the way out and Talk it over the state of California will Pay you but I will attend to the Expcs The case wont come up untill Jan 3 or 4 1917 so start about 29 off this month You know that the silent Road is the one and say nuthing to any Body the fewer People no it the Better when you ariv Registure as Evansville Ind little More Milege Yours Truly F. C. Oxman".
 As a result of his correspondence with Oxman, Rigall came to San Francisco arriving here January 6, 1917. He remained *45 until January 26, 1917, but did not testify upon the trial of petitioner. Therefore, granting that the above quoted letters are suspicious and questionable in character and were written by Oxman for the purpose of improperly inducing Rigall, who it will shortly appear was not in San Francisco on the day of the explosion, to testify that he was here at that time and saw Oxman and thus to that extent corroborate the latter, the fact of the matter is that Rigall did not so testify, or appear at all upon petitioner's trial, and petitioner was not in any manner prejudiced upon his trial by such assumed corruption on Oxman's part. In addition, proof of such improper motive on the part of Oxman in writing the Rigall letters, would not be the equivalent of establishing by substantial evidence that Oxman himself had committed perjury in testifying at petitioner's trial. At the most, the letters indicate an attempted subornation of perjury. However, subsequent to the publication of the Oxman- Rigall letters, the grand jury investigated the entire situation. At its sessions, Oxman and others testified. No charges were returned against him. Thereafter, Oxman was arrested on complaint of one of petitioner's supporters. A preliminary hearing was had and Oxman was held for trial on a charge of subornation of perjury. Upon his trial, he was acquitted. Before the grand jury and upon his trial, Oxman testified that the first letter, as quoted above, and as introduced in evidence here, is incomplete and that as originally written and mailed to Rigall it contained a third page on which he had penned a "P. S." telling Rigall "If you were not in San Francisco on July 22nd cannot use you as witness. Wire Answer. F. C. O."
 Oxman, who is now deceased and who was not available as a witness in this proceeding, also gave testimony upon these occasions in explanation of the wording of the letters. In substance, he there testified that when he was interviewed by Captain Bunner in Durkee, Oregon, which was prior to his coming here as a witness, he had informed Bunner, in addition to narrating the events witnessed by him on the day of the explosion, that he had met "a boy" in San Francisco on that day whom he had known many years previously and whom he thought he could locate. (Bunner's and Fickert's testimony before the same grand jury, also read into this record, and Fickert's and Cunha's testimony herein, corroborate *46 Oxman to this extent.) Upon those occasions Oxman further testified that when he later arrived in San Francisco, the district attorney and his deputy Cunha in going over his testimony with him suggested that he write to the person whom he had previously mentioned he had seen here on the day of the explosion; that they told him of the difficulties they were experiencing in getting witnesses to testify against the "dynamiters" and that because of this suggested that he so frame his letter as to conceal the fact that the bomb cases were involved; that he thereupon wrote the letters to Rigall, believing he was the person he had met in San Francisco on the day of the explosion, and that the purpose of framing the letters as written was to get Rigall out here without betraying the fact that he was to be a witness against the bomb defendants; that the expression in the second letter to the effect the "silent road is the one and say nothing to anybody", was prompted by the admonition of the district attorney's office not to discuss the case with anyone; that neither District Attorney Fickert nor his prosecuting deputy, Cunha, suggested the form of the letters and neither had seen them after the witness had written them. A third letter written by the witness to Rigall's mother was explained as an attempt on his part to procure a character witness and thus lend weight to his testimony. Fickert and Cunha, when on the stand in this proceeding, substantiated Oxman's testimony given upon the earlier hearings to the effect that they were without knowledge of the form or contents of his letters to Rigall. Each testified, in substance, that Oxman, without suggestion or dictation from them, as to the phraseology of the letters, was permitted to contact the party he stated he had met here on the day of the explosion. They disclaimed all knowledge of the contents of the Oxman-Rigall letters until their publication subsequent to the trial of petitioner. Petitioner has produced no substantial evidence to the contrary. In fact, the testimony of Rigall given upon the Oxman grand jury investigation and the later Oxman trial, tends to support the claim of the officials that they were without knowledge of the contents of the letters. In each instance, Rigall testified that when previously here in response to the Oxman letters he did not show them to anyone and told Cunha that they were at his home, in Illinois when, in fact, they were resting secretly in his pocket. Under *47 all the circumstances, we find and conclude that even if Oxman was influenced by any improper motive in writing the quoted letters to Rigall, yet the prosecuting officials were not parties thereto and were without knowledge of their contents, until a time subsequent to petitioner's trial.
 [12] There is some conflict as to what transpired after Rigall arrived in San Francisco pursuant to the Oxman letters. Rigall, a victim of paralysis, could not be examined as a witness in this proceeding. It was stipulated, however, that he would testify substantially in conformity with an affidavit executed by him on April 4, 1917, and as he had upon three distinct occasions subsequent to petitioner's trial. The testimony so given by Rigall is now relied on by petitioner as establishing the alleged perjury of Oxman upon his trial. It is not our intention to state separately the testimony of Rigall upon these several prior occasions, viz., the Oxman grand jury investigation, the Oxman preliminary hearing and the Oxman trial, all mentioned above. The substance and effect of his testimony upon those three occasions is that when he (Rigall) arrived in San Francisco pursuant to his correspondence with Oxman, he registered under the name of Charles which he subsequently changed to Rigall, explaining to those concerned that he frequently employed the name of his stepfather; that he saw Oxman at the hotel, whereupon Oxman told him of the bomb cases and asked him to testify that he was in San Francisco on the day of the explosion and had met Oxman that day; that he told Oxman he could not so testify because he had not been here on that day; that Oxman then suggested to him that he was here "as much as I was"; that he met the district attorney a few days later and when introduced to him by Oxman told Fickert that it was the first time in twenty years, excepting the day of the explosion, that he had seen Oxman; that in so misleading Fickert he told an untruth because (though undisclosed to Fickert) he had not seen Oxman on the day of the explosion; that he never did tell Fickert that he was not in San Francisco on that day; that he went over his testimony with Cunha and did not tell him he had not been in San Francisco on the day of the explosion; that he lied to Cunha in this respect on several occasions and caused him to believe he (Rigall) was in San Francisco on the day of the explosion and met Oxman; that the night before he was to take the *48 witness stand upon petitioner's trial he told Cunha for the first time that he had not been here on July 22, 1916, whereupon Cunha said, "well, if that is the case, we can't use you"; that upon query of Cunha he told him that Oxman was an honest man and "on the square"; that he so assured Cunha in spite of the fact that Oxman had assertedly attempted to get him to perjure himself; and that he was "not accusing anybody in this transaction of anything wrong except Mr. Oxman. I am accusing him of attempting to bribe me to give false testimony. As far as the district attorney's office is concerned, I don't know whether they knew anything about it or not. I don't know that."
 Therefore, if Rigall's testimony upon these prior occasions is accepted at its face value, it fails to establish any improprieties upon the part of the prosecution. It merely charges Oxman with improper conduct in his dealings with Rigall. However, in the face of Rigall's own admissions of falsehoods and of his admitted, but assertedly abandoned, effort to mislead the prosecuting officials as to his presence here on the day of the explosion, we are of the view, and accordingly find and conclude that he has proved himself unworthy of belief. Oxman testified upon his trial for subornation of perjury that when he met Rigall at the Terminal Hotel on Saturday evening he realized he had made a mistake and that Rigall was not the person he had seen in San Francisco on the day of the explosion; that he so informed Rigall; that on Monday morning he saw Fickert in the Terminal Hotel, introduced Rigall to him and said to Fickert "I told you I was going to have a boy come out here and I have got an old gray-headed man. I have made a bad mistake"; that Rigall in response to Fickert's query then said it was his first visit to San Francisco; that Fickert said, "Never mind, all of us make worse mistakes than this"; that he subsequently told Cunha of his mistake in getting the wrong man out here and Cunha suggested that Rigall be kept here until he (Oxman) had testified in order to be prepared to meet a situation that might arise in the event the defense on cross-examination of Oxman attempted to make capital of Rigall's appearance here and his subsequent failure to take the stand; that after Rigall's arrival here and discovery of the mistake that had been made, he (Oxman) never contemplated Rigall as a witness in the bomb cases and never heard Fickert or Cunha *49 refer to Rigall thereafter as a possible witness; and that he never offered to pay Rigall any money to be a witness.
 Fickert's testimony before the grand jury that investigated the Oxman- Rigall situation following publication of the above-quoted letters, substantiates Oxman's version or explanation of the happenings subsequent to Rigall's arrival here pursuant to said letters. Fickert there testified that he met Rigall for the first time at the Terminal Hotel on the 8th or 9th of January, 1917, which was two or three days after Rigall's arrival here; that on that occasion he inquired of Oxman whether the "boy" he previously stated he had met on the day of the explosion, had arrived; that Oxman said "no, I have a man here. I have made a mistake. I will pay his expenses"; that Oxman thereupon called Rigall over and introduced him; that Rigall's testimony was not discussed because Rigall "informed me at that time that he had not been in the state"; and that Rigall was permitted or requested to remain here until after Oxman testified upon petitioner's trial because his presence in San Francisco was known and cross-examination of Oxman thereon was anticipated.
 In their testimony in this proceeding, both Fickert and Cunha testified that when they, respectively, first met Rigall, Oxman disclosed that he had made a mistake and had sent for the wrong person; that Rigall thereupon told them he was not in San Francisco on the day of the explosion; that from that time forward they entertained no intention of using and thereafter made no effort to use Rigall as a witness in the bomb cases; and that he was merely requested to remain here until Oxman had testified, to be available in the event he should be needed to meet any possible cross-examination of Oxman as to Rigall's presence in San Francisco but his failure to appear as a witness. They each contradicted and denied, while on the stand herein, any prior statements or testimony of Rigall in conflict therewith and Fickert also testified herein that when he remonstrated with Rigall for coming to San Francisco in response to the Oxman letters when it definitely appeared therefrom that a person was being sought who had seen Oxman in San Francisco on July 22, 1916, Rigall explained his conduct by saying that he was an old friend of Oxman's son, whom he had previously *50 helped out of minor "scrapes", and that he thought the letters were from the son who again needed his assistance.
 [13] For the reason already mentioned, the prosecution had Rigall remain in San Francisco until after Oxman had testified upon petitioner's trial. Thereupon he was paid approximately $150 for expenses incident to his trip here and on January 26, 1917, left for his home in Illinois. After his arrival there, he addressed a letter to Cunha on February 6, 1917, wherein, among other things, he expressed the hope that Cunha was getting along well with the case. Three days later (February 9, 1917), the jury returned its verdict finding petitioner guilty as charged. Upon learning of this, and apparently "out of a clear sky", Rigall on February 12, 1917, and before denial of motion for new trial, sent a telegram to Cunha reading: "Congratulations on your conviction. I believe my evidence will get party new trial." Immediately upon receipt of this wire, Cunha, on February 13, 1917, which was only four days after the return of the verdict, telegraphed Rigall, saying: "Cannot understand your telegram. You told me your friend was thoroughly truthful and reliable. We have plenty of other witnesses and conclusive evidence supporting his testimony. Am astonished at your suggestion that you have testimony to help defendant. It is your duty to reveal to me at once any and all facts which you have because I certainly want this defendant to have a new trial if he is entitled to it. Wire me fully all details at once. Explain in detail your telegrams and your attitude. Be careful and fair because any witness who has testified falsely in this murder case must himself be prosecuted for murder. [This sentence undoubtedly has reference to section 128 of the Penal Code.] You should have told me anything you know before the witness testified. After wiring write me every slight notion even which you have on the case and send all data. I am sure you know nothing to get defendant new trial but I personally feel responsible and would later on have the governor change penalty or pardon if I developed any kind of doubt. At present, I am thoroughly satisfied even without your friend's testimony just as the jury was in the first case, but I want everything cleared up in my mind. Wire immediately to me at Olympic club, San Francisco." *51
 Rigall did not respond in any way, to Cunha's request for enlightenment upon the surprising but obviously deliberately uninformative statement in his (Rigall's) telegram. In other words, nothing further developed in the matter at the time. Petitioner's motion for a new trial was denied on February 24, 1917. Based on Rigall's "congratulatory" telegram of February 12, 1917, petitioner now charges the prosecution with the suppression of material evidence because of its failure to call the telegram to the attention of the trial judge prior to his ruling on and denial of the motion for new trial. On the record now before us, we think the charge is without foundation. Accepting the Oxman-Fickert-Cunha version, as we do, of developments subsequent to Rigall's arrival here pursuant to the Oxman letters, the prosecution upon receipt of Rigall's "congratulatory" telegram was confronted with a situation which showed Rigall's arrival here, an immediately admitted mistake in sending for and getting the wrong person, and Rigall's then assurance of Oxman's honesty and integrity. Rigall's only connection with the case had been through Oxman and it is only reasonable that Rigall's equivocal telegram as to his undisclosed "evidence" getting petitioner "a new trial", should cause the prosecution to assume that he had reference to the testimony of his friend Oxman, which testimony at the time was unassailed and unimpeached. The natural and only course for the prosecution to pursue, and the one it did pursue, was to attempt to ascertain what "evidence" Rigall had that caused him to repudiate his prior recommendation of Oxman as an honest and upright man. Failing, upon inquiry, to receive any response or enlightenment from Rigall, there was nothing of substance before the prosecution that it should have called to the attention of the trial court upon the hearing of the motion for new trial.
 On the other hand, should we accept the Rigall version, also set out above, as to what transpired after his arrival here in response to the Oxman letters, we find the prosecution, upon receipt of Rigall's "congratulatory" telegram, confronted with a situation where a person (Rigall) who had previously admitted his own duplicity and falsehood in a prior effort to mislead the prosecution as to his presence in San Francisco on the day of the explosion, thereafter asserting that he had undisclosed "evidence" that would secure *52 a new trial for petitioner. Failing, as already indicated, to get any response to its inquiry for information and enlightenment, the prosecution, in this situation, might well and reasonably assume that Rigall was again attempting to mislead the prosecution for reasons best known to himself.
 To require the prosecution upon motion for new trial to disclose to the trial court Rigall's unsupported declaration that he had "evidence" that would secure a new trial for petitioner, would reasonably call for a similar report by the prosecution of all such unfounded and unsupported statements that might come to its attention, and in cases as widely publicized as the so-called bomb cases there undoubtedly existed many of such unsupported statements and claims. In this connection, we therefore find and conclude that the prosecution did not deliberately, or otherwise, suppress any evidence material to the defense.
 It was shortly thereafter that Rigall asked the defense for $10,000 for the Oxman letters which, as already shown, were ultimately published with the consequent investigation and trial of Oxman.
 [14] Several years later and in 1921 a new and decidedly different assault was directed by petitioner at the testimony of Oxman in an attempt to prove him a perjurer. At that time, one Earl K. Hatcher and his wife appeared before the grand jury and gave certain testimony which, if truthful, would prove that Oxman had perjured himself upon petitioner's trial. The Hatchers appeared in this proceeding as witnesses for the petitioner and gave substantially the same testimony. Hatcher testified that he lives in Woodland, Yolo County, California; that he lived there on July 22, 1916, the day of the bomb explosion in San Francisco; that he was then engaged in the business of buying and selling sheep and cattle; that he had wired Oxman to come from Portland to San Francisco, by way of Woodland, to close a deal the witness had started with Miller & Lux; that Oxman telephoned to him about 7:00 A. M. on the morning of July 22, 1916, from the Byrnes hotel in Woodland; that he met Oxman in the lobby of the hotel approximately one-half hour later and talked with him there until 10:30 or 11:00 A. M., whereupon they repaired to the home of the witness for luncheon; that after eating at the home of the witness, Oxman had a sleep from approximately 1:00 to 1:50 P. M.; that at *53 the latter time the witness awakened Oxman, accompanied him to the train leaving Woodland at about 2:15 P. M. for San Francisco; and that Oxman telephoned to him from San Francisco at about 6:00 P. M. concerning the cattle transaction.
 Obviously, if this testimony is true, Oxman could not have been in San Francisco prior to 2:00 P. M. on the day of the explosion, as he testified upon petitioner's trial. However, for reasons presently to be mentioned, the testimony of Hatcher, and that of his wife who corroborated him to the extent of stating that Oxman had luncheon in her home on the day of the explosion and did not depart from there until approximately 2 o'clock in the afternoon, must be rejected as unworthy of belief. Their stories are indisputably disclosed to be a tissue of falsehoods by reason of their own prior contradictory statements and conduct and by the testimony of others. We shall develop the several matters which, in our opinion, deprive the testimony of the Hatchers of every vestige of credibility.
 After narrating on direct examination herein, the story stated in substance above, Hatcher also testified and admitted apparently in fear of its disclosure on cross-examination, that during the Mooney trial he had heard and read about the Oxman testimony and assertedly knew then that it was untrue; that he had previously told one Leake, publisher of a Woodland newspaper, that if Oxman testified he was in San Francisco in time to see the events described by him upon petitioner's trial, "he must have been"; that he (Hatcher) knew at the time he made this statement to Leake it was untrue, but that loyalty to Oxman prompted it; that in 1920 or 1921 he told Charles Sooy, an attorney, of the matters here testified to by him; and that in May, 1921, he narrated them under oath for the first time before the grand jury. On cross-examination herein, he admitted that he may have said to a dozen or fifty persons that Oxman was in San Francisco on the day of the explosion in time to witness the events he testified to on petitioner's trial; that he was in San Francisco with Oxman during the latter's trial for subornation of perjury, mentioned above; that upon his acquittal upon that charge Oxman was rearrested the same day on a charge of perjury (ultimately dismissed) and that he (Hatcher) arranged bail for him; that prior to his 1921 *54 disclosures, his wife had been annoyed, intimidated and threatened with prosecution by a named attorney who had formerly represented petitioner; that prior to the Oxman trial he had been offered $5,000 over the telephone by an unknown person for information (before the grand jury in 1921 he testified he had been offered $5,000 by letter to testify against Oxman upon his trial and that "a world" of money passed in the case); that though he assertedly knew that Oxman had perjured himself upon petitioner's trial, nevertheless in subsequent cattle deals he "trusted him (Oxman) implicitly" and had no writing showing his interest or share in profits aggregating a quarter of a million dollars; and that during the Oxman trial in 1917 he had signed an unsworn statement, which he now asserts he did not read but signed merely out of friendship for Oxman, attesting to the fact that Oxman departed from Woodland on the day of the explosion on a train that left at about 9:10 A. M.; that subsequent to Oxman's trial he (Hatcher) on several occasions by letter asked Oxman to lend him $10,000, which requests Oxman rejected; and that while he was aware of the possibility that Mooney might hang because of Oxman's assertedly false testimony, he refrained until 1921, out of friendship for Oxman, to disclose the matters here testified to by him. It was not until after Oxman refused to loan him $10,000 that he made any claim that he did not leave Woodland until afternoon.
 Mrs. Hatcher, while on the witness stand in this proceeding, offered the same unsatisfactory explanation for her silence for approximately four years.
 There was introduced in evidence here, the two unsworn statements signed by Hatcher and his wife wherein, in contradiction of their 1921 disclosures and their testimony in this proceeding, they averred, in effect, that Oxman was in Woodland on the day of the explosion at about 7:00 A. M. and departed on a San Francisco bound train leaving at approximately 9:10 A. M., which would cause him to arrive in San Francisco in time to have witnessed the events described by him on the witness stand in the Mooney trial. There is testimony of other witnesses herein to the effect that the Hatchers read these statements before signing them and that they were not sworn to solely because signed on a Saturday afternoon when a notary was unavailable. *55
 Cunha testified herein that after Oxman's arrest and during his trial, Hatcher had told him that he put Oxman on the 9:10 A. M. train.
 Paul Leake, called by the respondent herein, testified that he was the editor and co-owner of a Woodland newspaper; that he had known Hatcher for over twenty years; that in June, 1917, Hatcher told him, in the presence, he thought, of Mrs. Hatcher, that on the day of the explosion he (Hatcher) had put Oxman on the 9:08 A. M. train at Woodland; that he (Leake) wrote an article in his newspaper on June 14, 1917, which was placed in evidence, concerning his conversation with Hatcher and in which he quoted Hatcher as stating that Oxman left Woodland on the "9:08 o'clock train, in time to arrive at the San Francisco ferry to witness everything that he testified to at the Mooney trial" and that he (Hatcher) had "known Oxman for some time and have always found him square".
 Railroad time tables, properly identified and introduced in evidence, established that on the day of the explosion a passenger train arrived in Woodland at 9:08 A. M. and left for San Francisco at 9:13 A. M., arriving at Oakland at 12:23 P. M. and connecting with the boat that arrived in San Francisco at 12:50 P. M.
 The time of arrival of said train in San Francisco checks substantially with the time specified by Oxman upon petitioner's trial for his arrival in San Francisco and the time of its departure from Woodland checks substantially with the time designated by the Hatchers in their signed, but unsworn, 1917 statements giving the time of Oxman's departure for San Francisco and likewise checks with Leake's testimony herein as to the time Hatcher informed him that Oxman left Woodland.
 On the other hand, these same time tables fail to disclose any passenger train leaving Woodland for San Francisco at about 2:15 P. M., the time now fixed by Hatcher for Oxman's departure from Woodland. They do disclose such a train leaving Woodland at 2:55 P. M., which did not, however, come direct to San Francisco but necessitated San Francisco bound passengers to transfer at Davis to another train that connected with a boat arriving in San Francisco at 6:30 P. M. It must be remembered in this connection, that Hatcher testified herein that Oxman phoned him from San Francisco about *56 6:00 P. M. Had Oxman taken the 2:55 P. M. train he could not have phoned from San Francisco at 6:00 P. M.
 In view of their prior inconsistent and contradictory statements, in view of their admitted falsehoods, and in view of the other testimony and documentary evidence in conflict with their 1921 disclosures and their testimony herein, we find and conclude that the Hatchers are not worthy of belief. Whether the "world" of money that Hatcher referred to upon another occasion as having passed in this case, had anything to do with their change of story, or whether Oxman's failure to "lend" them $10,000 when requested, prompted their change of attitude, shall probably always remain a matter of conjecture.
 [15] We disregard with mere passing mention, petitioner's improper and abortive effort to establish herein that Oxman upon another occasion and in another court proceeding, foreign to the bomb cases and arising in another state, had assertedly perjured himself and attempted there too, to procure Rigall as a corroborating witness. Objection was properly sustained to this evidence and the same was properly stricken out as hearsay and as entirely irrelevant and incompetent to the issues here involved. It presents but one of many instances wherein petitioner has encumbered the present record with highly improper evidence. However, inasmuch as the evidence appears in the record by way of an offer of proof, we experience no hesitancy in saying that, even if properly before us, it fails, in our opinion, to show either that Oxman upon said prior occasion committed perjury or improperly sought Rigall as a corroborating witness.
 Before leaving the Oxman phase of this proceeding, we desire to also point out that the district attorney testified herein that prior to putting Oxman on the stand in the Mooney case, he had been assured, upon inquiry, by certain named officials of the Western Meat Company and the Kern County Land Company, who had previously had dealings with Oxman, that Oxman was a substantial citizen and a person of honesty and integrity. Of course, also pertinent here, is the additional testimony of the district attorney and his prosecuting deputy, referred to above in another connection, that they at no time or in any manner attempted to influence any witness in the giving of his or her testimony. *57
 [16] In an effort to establish that an automobile could not have been at Steuart and Market Streets as testified by Oxman, petitioner has read into the record herein the testimony given at the later trial of Weinberg by the eighteen police officers constituting the traffic detail on Market Street on the day of the explosion. Many indicated that they were not on Market Street all of the time but were otherwise engaged on intersecting streets. Others intimated they were too occupied with the crowds to state definitely whether or not an automobile had gone down Market Street. A few said they saw or recalled only an official parade car. Still others testified that cross-town traffic, or traffic crossing Market Street, was permitted to proceed until the parade was within one block. It is not for us to speculate as to the course taken by the automobile prior to Oxman's observation of it. We do not think the testimony of the officers is capable of all that petitioner claims for it. Moreover, it should be pointed out, that Oxman was not alone in his testimony as to the presence of an automobile at Steuart and Market Streets shortly prior to the explosion. Ralph Doscher, a dentist, testified herein that on July 22, 1916, he was on Steuart Street near Market Street between 1:30 and 2:00 P. M. and that he saw an automobile there. Henry Doscher, father of said witness, and now dead, was produced at petitioner's trial, according to the transcript thereof, to testify on rebuttal to the same fact but the trial judge rejected the evidence on the ground it was properly part of the prosecution's case in chief. The incident is mentioned in substantiation of Fickert's testimony herein that he had other witnesses available during petitioner's trial corroborative of the presence of an automobile, and thus tending to rebut the charge that Oxman perjured himself. Henry Doscher did testify for the prosecution in the Rena Mooney and Weinberg trials and, pursuant to the agreement of counsel herein, the same was copied into this record for all purposes and as though given at petitioner's trial, all the bomb cases being treated as one in this attack. Upon those trials he testified that shortly prior to 2:00 P. M. an automobile, with several persons in it, came down Steuart Street from the direction of Market, causing him and others forming for the parade to move aside. *58
 Similarly, the testimony of Robert Bramlitt upon both the Rena Mooney and Weinberg trials was read into the present record. In each instance he testified that on the day of the explosion and about twenty minutes prior thereto he saw a small automobile on Steuart Street proceeding toward Mission Street.
 Gertrude Jackson testified herein that on July 22, 1916, she witnessed the parade from the mezzanine floor of a building on the north side of Market Street, opposite Steuart Street. Approximately ten or fifteen minutes before the explosion, she testified she saw an automobile turn into Steuart Street. Her testimony upon the Weinberg trial was to the same effect and was placed in evidence herein.
 Albert Brady, one of the participants in the parade, testified that he was on Steuart Street, ready to fall into line, when about fifteen or twenty minutes before the explosion he was required to step aside to permit a small black touring car to pass. He also testified he was subpoenaed for petitioner's trial but was not called as a witness (again substantiating Fickert as to the availability of such witnesses) though he testified in the Rena Mooney and Weinberg trials. His testimony upon those occasions appears in the record.
 There also appears in the record herein the testimony of J. Walter Smith, now deceased, given upon the Rena Mooney and Weinberg trials and to the effect that shortly prior to the explosion he saw an automobile "diagonally across the corner facing towards Steuart Street, facing east ... as if it were turning out of Market Street into Steuart Street" with "a man at the wheel and a woman sitting in the back seat," the latter looking in the direction of a group of men standing near the saloon door. This substantiates that part of Oxman's story to the effect that Mooney, Billings and the unidentified man had temporarily gone from the automobile, leaving Weinberg at the wheel and Rena Mooney in the back seat.
 The testimony of Walter G. Logan, a police officer, given at the Rena Mooney and Weinberg trials and received herein pursuant to agreement, indicates that while the witness was stationed at Steuart and Mission Streets on July 22, 1916, he observed an automobile some time between 1:30 and 2:00 P. M. approaching on Steuart Street from the direction of Market and that it turned west on Mission Street. The Eilers *59 building, where petitioner claims to have been all of the time, is west of Steuart Street.
 Israel Weinberg testified herein on behalf of petitioner that he had known Mooney prior to the explosion but that he (Mooney) had not ridden in the jitney bus of the witness for several weeks prior to the explosion. Weinberg also testified that he was not on Market Street or near 721 Market Street between 1:30 and 2:00 P. M. on the day of the explosion. On cross- examination, he admitted that this was in conflict with his statement given to the police on July 31, 1916, shortly after his arrest wherein he admitted that he was in his jitney bus on Market Street near Third Street (and it should be kept in mind that 721 Market Street, where the Edeaus and Officer Moore placed him, is between Third and Fourth Streets) at a time when he could see the parade near the Ferry, which necessarily had to be after 1:30 P. M., the starting time of the parade. He attempted to explain herein that said statement was the result of third degree measures applied by the police. In view of his prior inconsistent statements, the mass of contradictory evidence, and the additional fact that Weinberg testified at petitioner's trial where his testimony was impliedly rejected by the verdict of the jury, we place no credence in his story.
 In passing it should also be pointed out that there was ample credible evidence upon petitioner's trial (see People v. Mooney, 177 Cal. 642, 647 [171 P. 690]) and upon the trial of the other bomb cases, corroborating both MacDonald and Oxman as to the presence of a suitcase at the place of the explosion. Much of said evidence appears in the present record.
 Louis Ferrari, the deputy district attorney who prosecuted the later Rena Mooney and Weinberg cases gave as his reason for not calling Oxman as a witness therein, the fact that Oxman himself was then under investigation and a defendant, as already explained, and the prosecution did not desire to be confronted with such collateral issues. This is interpolated at this point merely because of petitioner's effort to draw an unfavorable inference from Oxman's nonappearance at the later trials.
 With all of the foregoing before us, together with a vast number of other matters, we find and conclude that petitioner has not established by any substantial, credible evidence his *60 charge that Oxman perjured himself when upon the witness stand during the petitioner's trial; and that likewise petitioner has not established by any substantial, credible evidence that the prosecuting officials were guilty of any irregularities or improprieties in the production of Oxman's testimony.
 [17] We turn our attention now to the testimony of Mellie and Sadie Edeau, mother and daughter, given upon the trial of petitioner and which testimony is also here assailed as perjurious in character. For all material purposes, they told substantially the same story when on the stand. Mellie Edeau testified, in effect, that on the day of the explosion she came to San Francisco, from her home in Oakland, in company with her daughter; that they were standing in the vicinity of 721 Market Street, near the entrance to the adjacent Kamm building, at approximately 1:30 P. M.; that between that time and 1:40 or thereabouts she saw Billings on the roof of the building situate at 721 Market Street (which is a low, two-story building), leaning over the parapet, holding a suitcase which was resting thereon; that at the time he was talking to someone on the sidewalk below; that shortly thereafter she saw Mooney and Rena Mooney rush into the entrance of the Kamm building where they remained for three or four minutes; that they came out of the entrance to said building whereupon petitioner fixed something for his wife to sit on; that she next saw Billings on the sidewalk, close to the curb, talking to a policeman, identified by her as Officer Moore, who "had been honking the horn" of an automobile parked at the curb; that Mooney and Rena Mooney then joined Billings, who was still carrying the suitcase, and the three of them "brushed right past me", Billings saying that they would "have to make the Ferry before two o'clock"; and that shortly thereafter Weinberg (whom the witness indicated from the stand) cranked the automobile and drove "towards the Ferry", with "a dark man" who had climbed into the rear seat of the car. (This unidentified, "dark man", might well be the "Spaniard" or "Mexican" described by Crowley, as indicated above, and the unidentified "foreigner" mentioned to the district attorney by Oxman, who possibly uttered the "foreign language" referred to in the Oxman Kansas City affidavit.) Mellie Edeau testified further that all of said persons had left the vicinity of *61 721 Market Street "quite a few minutes" before the parade came along.
 The Edeaus also testified at the prior Billings trial and at the later Rena Mooney and Weinberg trials and their testimony in each instance has been read into this record at petitioner's request. Inasmuch as the charge of perjury directed at the testimony of the Edeaus is based in part at least upon asserted discrepancies in their testimony at the several trials, we shall first point our attention in that direction. Preliminarily, it should be stated that upon each trial they positively identified Billings as the man they had seen with a suitcase between 1:30 and 1:40 P. M. on the day of the explosion, first on the roof of 721 Market Street, then talking to a police officer at the curb, then meeting and departing with a man and woman, in an easterly direction toward the ferry. In the foregoing respects their testimony was consistent throughout the several trials. Reference is made to the fact that upon the Billings trial, which preceded the others, the Edeaus did not designate or name Mooney, Rena Mooney, or Weinberg, as they did upon the later trials, as the other persons they had observed. This same point was made and developed upon cross-examination of the witnesses during petitioner's trial and judging from the verdict was apparently found by the jury to lack significance. Be that as it may, an additional explanation therefor exists. When cross-examined upon the matter in petitioner's trial, the Edeaus testified that upon the prior Billings trial they had not named petitioner, his wife, or Weinberg, because the queries there propounded to them did not require it. Each did, however, as already shown, testify upon the Billings trial that Billings had met "a man and woman" in the vicinity of 721 Market Street. By the propounding of a single question upon cross- examination, the defense, in all probability could have ascertained the identity of the "man and woman" referred to by the Edeaus. The failure of the prosecution in the Billings case to ask the Edeaus on direct examination the identity of said "man and woman", finds explanation in the theory that the prosecution in trying that case elected to concentrate upon the defendant then on trial without any special effort being made to uncover or identify the others involved. James Brennan, the deputy district attorney who prosecuted Billings, gave testimony herein that he proceeded *62 with the trial upon this theory. He is substantiated by the fact that not only were the Edeaus not asked on direct examination to identify the "man and woman" whom they testified Billings had met at 721 Market Street, but upon the same trial the witness MacDonald, whose testimony has been discussed, after narrating what he had observed at Steuart and Market Streets, was not asked on direct examination to identify the "man" whom he observed meeting Billings at the saloon door. Inadvertently or otherwise, the defense in that case put the question to MacDonald on cross-examination and he unhesitatingly named Mooney as the man. The defense on cross-examination made no effort to have the Edeaus enlighten the jury as to the identity of the persons they had observed with or near Billings at 721 Market Street.
 At this point it may be well to interpolate a possible explanation for the presence, approximately one-half hour before the explosion, of Billings, Mooney, his wife, and Weinberg in the vicinity of 721 Market Street which place is several blocks west of the scene of the explosion. Such possible explanation appears in the testimony herein of Cunha, the deputy district attorney who prosecuted petitioner, who declared, in part, that "directly across from 721 Market street was the headquarters of the preparedness day parade committee, or something to that effect and the general theory with regard to what the people were up to with the bomb, and all of that, was to break up the parade, strike terror into the marchers, and all that, and break up the parade. That was the general idea. But as to any other theory as to 721 Market street, or any other place, I had no particular theory as to what they were doing at any particular place". At another point we shall have more to say about petitioner's active opposition to the parade whose participants and onlookers were ruthlessly struck down by the bomb explosion. The reason assigned by Cunha for the presence in the vicinity of 721 Market Street of persons interested in stopping the parade, lends substance to the testimony of the Edeaus and tends to minimize or destroy petitioner's charge of perjury and frameup.
 To revert to the Edeaus, we find that in his effort to show that Mellie Edeau, the mother, perjured herself upon his trial, petitioner has offered testimony herein intended to establish that prior to her appearance on the witness stand in the first *63 of the bomb cases (the Billings case) she assertedly had made statements tending to indicate that she was not in the vicinity of 721 Market Street as testified by her upon all of the trials, including petitioner's, but had remained several blocks easterly thereof, near the scene of the explosion. In this effort, petitioner upon this proceeding produced as witnesses, among others, Thomas J. Stout, William H. Burgess, William H. Smith, Walter J. Peterson, and, being unable to locate Muriel Stewart, her testimony given upon the trial of Rena Mooney was read into the record.
 Stout testified, in substance, that three or four days after the explosion Mellie Edeau told him at Foreman & Clark's in Oakland, where both parties worked, that on the day of the explosion she had seen two middle-aged men, with a suitcase, at Steuart and Market Streets, and had seen the explosion; that the witness suggested that she get in touch with Chief Peterson of the Oakland police department; that a day or two later she told the witness she had been to San Francisco and could not identify the two "boys" they were holding there as they were too young; that he had read Mellie Edeau's testimony in both the Billings trial and the subsequent Mooney trial; that at the time of reading her testimony in the newspapers he did not know, but assumed, that 721 Market Street was one and the same location with Steuart and Market; that he was afraid of being "canned" from his job and therefore "kept quiet" during the Billings and Mooney trials and made no disclosures until the later Rena Mooney trial at which time he telephoned a newspaper and told his story and signed an affidavit averring, among other things, that Mellie Edeau had told him she could not identify Mooney or Billings. On cross-examination, the witness admitted the affidavit was executed by him on February 19, 1917, which was during the pendency of petitioner's motion for new trial and in his testimony in the subsequent Rena Mooney trial, which has been read into this record, the witness testified that he had told his story to the newspaper "before the Mooney case was finished". Yet, he testifies in this proceeding that his testimony upon the Rena Mooney case "was a mistake" and that, in fact, he kept quiet until after the "Mooney case was finished".
 [18] In addition to the witness's own admission of a "mistake" in his story as told under oath upon an earlier *64 occasion, which tends to detract from the credibility of the witness, we have the admission of defense counsel in the Rena Mooney case, where an assault also was being made upon the testimony of Mellie Edeau, that the Stout "affidavit was made on this motion for a new trial" in petitioner's case. It was, therefore, available upon motion for new trial and may not now be urged on habeas corpus. Moreover, the Stout affidavit, which appears in the record herein, tends to indicate that he knew of Mellie Edeau's alleged perjury during or at the end of the Billings trial while his testimony herein tends to indicate he did not know of it until a later date. The uncertainty and vacillation of the witness deprives his testimony of value. Finally, we have the positive denial of Mellie Edeau in her testimony upon the later Weinberg trial, read into this record by petitioner, that she had ever talked with Stout in connection with "this case".
 Burgess and Stewart, mentioned above, were also fellow employees of Mellie Edeau at the firm of Foreman & Clark. The former, in his testimony in this proceeding, and the latter, in her testimony upon the Rena Mooney trial, read into this record because the witness could not be located to testify herein, told substantially the same story as the witness Stout, viz., that at their place of employment they had heard Mellie Edeau state a few days after the explosion that she had seen two middle-aged men carrying a suitcase near Steuart and Market Streets and that Mooney and Billings were too young and were not the men. Each admitted having informed one of petitioner's then counsel of the entire situation prior to denial of petitioner's motion for a new trial. Each also executed an affidavit prepared by said counsel. It is significant that although Stout, Burgess and Stewart have testified that Mellie Edeau informed them of being only at Steuart and Market Streets on the day of the explosion, and not at 721 Market Street as she testified upon the several trials, that the affidavits prepared by one of petitioner's then counsel from the information given to him by said witnesses at or during the Mooney trial, and respectively executed by Burgess and Stewart in February, 1917, are, and each is singularly free of any and all reference to Steuart and Market Streets. Mellie Edeau having testified at the Billings and Mooney trials that she was in the vicinity of 721 Market Street, several blocks west of Steuart and *65 Market Streets, it seems inconceivable, if she had previously told three persons of being only at Steuart and Market Streets and they had told one of petitioner's then counsel of the situation and he had thereupon prepared and had them execute affidavits, that two of such affidavits should remain silent upon and make no reference to Steuart and Market Streets.
 Moreover, it is significant to note that the Stewart affidavit contains an averment that Mellie Edeau had told the affiant that "she had been right near where the explosion had occurred but fortunately I had moved on further up the street". As will presently appear, this averment is in substantial accord with the explanation given by Mellie Edeau of her movements on the day of the explosion. It should also be mentioned, that Mellie Edeau when testifying in the Rena Mooney and Weinberg cases, which testimony we have indicated was read into this record at petitioner's request, denied, as she did with the witness Stout, having ever discussed "this case" with Burgess or Stewart. Under all the circumstances, we can attach little credence to the Stout, Burgess and Stewart testimony.
 [19] In his effort to destroy Mellie Edeau's testimony that she was in the vicinity of 721 Market Street about one-half hour prior to the explosion and while there had observed petitioner and his wife with Billings, who carried a suitcase, petitioner also produced Peterson and Smith, already mentioned, as witnesses in this proceeding. Peterson testified that in 1916 he was the chief of police of the City of Oakland; that on July 27, 1916, five days after the explosion, Mellie Edeau appeared at his office and said she was at Steuart and Market Streets on the day of the explosion and had seen two middle-aged, medium sized, men with a suitcase, whom she thought she could identify; that she also informed him that she had heard the explosion, had seen the ambulances that responded and that she was unable by reason of the crowded condition of the streets to get farther west on Market Street; that she inquired if she might use her maiden name so that she would get out of the case with a minimum of publicity and disturbance in the event she should be unable to identify the persons she had seen; that he told her such a course would be proper provided she gave her correct name if she should identify anyone; that he thereupon detailed Officer *66 Smith, whose testimony will be later set forth, to accompany Mellie Edeau to San Francisco; that Smith later reported to him that she had told him Mooney and Billings, whom she had viewed in jail in San Francisco in company with Smith, were not the men she had seen; that Smith's report of Mellie Edeau's visit to San Francisco was made a part of the Oakland police records; that he and Smith had several conversations concerning the story assertedly told to them by Mellie Edeau and the story subsequently narrated by her on the witness stand; that the last conversation with Smith on the subject was approximately three months after the Mooney trial, at which time he detailed Smith to accompany several of the defense counsel in the bomb cases and Fremont Older to the home of Mellie Edeau, a visit admittedly undertaken in the hope of procuring from her a repudiation of her testimony; that while said group was at her home they summoned him because she refused to talk in his absence; that he joined the others at her home and there inquired of Mellie Edeau how she could testify she had been at 721 Market Street in view of her earlier story to him that she had been unable to get beyond Steuart and Market Streets, whereupon the witness said she replied "my natural body was at Steuart and Market and my astral body was at 721 Market street".
 We are not inclined to attach much credence to the testimony of Peterson. On cross-examination, he proved to be a most evasive, uncertain and forgetful witness. He was equivocal and indefinite in many instances and upon occasions appeared to be unable to justify his conduct in the premises. He could not recall the times and places he had talked with the San Francisco police officers about the matters he testified to on direct examination. He did not know whether he had talked with Goff about Mellie Edeau prior to the Mooney trial. He did not think that the Oakland police reports were sent to the San Francisco police for inspection but explained if the latter wanted them they were available. He admitted having read the newspapers during the Billings trial which, as we have shown, preceded the petitioner's trial, and at which trial Mellie Edeau also testified, but said that the first information he had about her testimony was when Officer Smith "told me about her changing her testimony". However, a little further on in his cross- examination he admitted that the "first" time Mellie Edeau "changed" her story *67 (which, if the witness's version of "change" in story is accepted, would be during the prior Billings trial), Smith informed him it was the same woman who had come to his (the witness's) office shortly after the explosion. He admitted that he knew and read in the newspapers that Mooney had been convicted and probably would be sentenced to be hanged and that he "knew at that time that Mellie Edeau had told me a different story, had told a different story on the witness stand than she had told me in July", yet he admitted that he did nothing to direct the attention of either the prosecution or the defense to such asserted change of story by Mellie Edeau. In a feeble effort to explain his silence, he asserted that he "was never called into court" and that he did not tell the defense because he was "not trying to barge into a case" and disrupt the San Francisco police department's theory. He also stated that though he was aware that a man's life was in the balance at the time, he did not regard it "as my sworn duty as a police officer and as a chief of police" to inform either the prosecution or the defense, "because it was not my case" and his office was "not furnishing information for the defense until we were asked to and brought into court to do it in a legal way" and "that as far as the police department is concerned it is usually on the side of the prosecution" and "part of our job is to convict". By such declarations the witness discloses a questionable moral standard. He further testified on cross-examination that he did not know how the defense first learned of the matters testified to by him herein but said they came to him upon an earlier occasion and made inquiry and that he testified for the defense in the later Rena Mooney and Weinberg trials. Prior to so testifying, and assertedly without any change in the "policy" which placed him "usually on the side of the prosecution", he admitted having been with a group of defense counsel at the home of Mellie Edeau subsequent to petitioner's trial but before Rena Mooney's trial, in a visit planned and intended for the sole purpose of procuring a retraction or repudiation by her.
 As already indicated, Peterson here testified that when Mellie Edeau first came to his office she described to him what she had observed at Steuart and Market Streets and then informed him that she was unable because of the crowd to proceed farther west on Market Street. He also testified herein *68 that he thought he so testified in the Rena Mooney and Weinberg cases but when shown transcripts of his testimony in those two trials he admitted he found nothing therein (when his memory was undoubtedly fresher) about Mellie Edeau telling him she was unable to proceed farther west on Market Street than Steuart. In attempted explanation of his prior silence on this particular point he stated herein "I perhaps did not tell all I knew then". Mellie Edeau has never denied that she merely told Peterson and Smith of having seen two middle-aged men with a suitcase at Steuart and Market Streets but she has denied (in her testimony in the Rena Mooney and Weinberg cases, read in by petitioner) that she told them she was unable to get beyond Steuart Street on Market Street, testifying that on her first visit to Peterson's office she told him she had proceeded beyond Steuart Street. In those cases she also testified that when she came to San Francisco with Officer Smith, after having seen Peterson, she did so merely to ascertain whether the men then held in custody (Billings and Mooney) were the men she had told Smith and Peterson she had seen with a suitcase at Steuart and Market Streets between approximately 12:15 and 1:00 P. M. on the day of the explosion; that she saw them and informed Smith they were not the men. But, she went on to testify in those cases, she did recognize them as two men she had observed in the vicinity of 721 Market Street, whence she had proceeded from Steuart Street, about 1:30 or 1:40 P. M., acting in the manner described by her at the several trials; that though she so recognized them as the parties seen at 721 Market Street she did not inform Smith of the fact, though she indicated to him "they have got the right men"; that she did not acquaint Smith with her experience at 721 Market Street because she had promised her daughter she would not bring them into the bomb cases until they had first talked the matter over; and that not until questioned later by members of the San Francisco police department, but prior to any of the trials, did she disclose the matters testified to by her upon the trials. In other words, Mellie Edeau reconciled her story to Peterson and Smith with her testimony upon the trials and explained her conduct by stating that she did not tell "all she knew" when she first talked with them. It did not then appear material. The explosion had occurred at Steuart and Market Streets and *69 knowing this, it was her original purpose to disclose what she had observed at that place. Subsequent developments, and the testimony of several other witnesses who placed Billings at 721 Market Street, disclosed the relevancy of the other matters which she had observed on the day of the explosion in the vicinity of 721 Market Street, and as to which she thereafter testified consistently throughout the several trials. Her explanation that she had gone beyond and west of Steuart Street on Market Street finds support in her testimony in the Rena Mooney and Weinberg trials where, in describing the men she had seen with the suitcase near Steuart Street, she testified that she had observed them on Market Street "between Steuart and Spear", the latter street being west of the former.
 At this point, it may be well to also state that in her testimony in said Weinberg trial, Mellie Edeau denied the assertion herein of Peterson and McKenzie, the latter one of former defense counsel, that she had stated subsequent to the Mooney trial and upon the occasion of the "visit" at her home, already mentioned, by two of the former defense counsel, together with Smith, Peterson and Older, that her natural body was at Steuart and Market Streets while her "astral body" was at 721 Market Street. She also there testified that following her appearance as a witness at the Mooney trial she had been harassed to such an extent that her home had been guarded day and night.
 Under all the circumstances, we conclude that by reason of his equivocation, indefiniteness, lack of memory of important details, and his personally disclosed questionable moral standard, illustrated by his admitted silence when a life was in the balance, Peterson cannot be accepted as a credible witness.
 [20] We turn now to the testimony herein of Officer Smith who, as already shown, was detailed by Peterson, his chief, to accompany Mellie Edeau to San Francisco on the occasion of her first visit to see the persons then held in custody. He testified, as did Peterson, that Mellie Edeau at that time told him she had seen two middle-aged men carrying a suitcase on the day of the explosion near Steuart and Market Streets, and that she did not mention being farther west in the vicinity of 721 Market Street. He also testified that he brought her to San Francisco to see Mooney and Billings, who were then *70 held in custody; that after seeing them she told "me that she never saw the men before"; that no statement was taken from her, and that he made and filed his official report with the Oakland police department. Examination of the report so filed by him, which report was copied into the record herein, discloses that it significantly states that "she failed to identify them (Mooney and Billings) as the two men she saw around Steuart and Market Streets". This is not the equivalent of his statement here that Mellie Edeau said she "never saw the men before", and it should be kept in mind that the report of the witness was made many years ago, immediately after the transaction, and when the matter was fresh in his mind, whereas his testimony was given in this proceeding after the lapse of more than twenty-one years. It may be said that on the whole, Smith's narrative of Mellie Edeau's story to him is reconcilable with the testimony given by her upon the trials, having in mind the explanation offered by her, and discussed above in connection with the Peterson testimony, as to the purpose of her original visit being merely to ascertain whether the men then held in custody were the persons she had seen with a suitcase near Steuart and Market Streets. Moreover, accepting the testimony of Smith at its face value, as a witness he is subject to the same criticism made of Peterson for having remained silent throughout the Billings and Mooney trials when human lives hung in the balance.
 Petitioner also attempted to prove by Smith when on the stand in this proceeding that he (Smith) had informed District Attorney Fickert during the Mooney trial of the alleged change in the story of Mellie Edeau. This effort proved futile. Smith did testify he had talked with Fickert about the failure of Mellie Edeau to identify Mooney or Billings on the occasion of her visit to San Francisco with him, but went on to testify that he did not recollect whether that conversation occurred prior to the termination of the Mooney trial, and he also testified he did not recall Fickert saying at the time he would be "a good witness for the defense". In an effort to establish that the witness had previously stated that his conversation with Fickert occurred on January 30, 1917, during the Mooney trial and that Fickert then said he (Smith) "would make a good witness for the defense", petitioner produced and read to the witness, over objection of *71 the respondent, what purported to be an affidavit containing averments to that effect, and assertedly executed by the witness on April 8, 1918. As originally typewritten the affidavit fixed the date of the alleged conversation between the affiant and Fickert as "July" 1917 (which would be several months after petitioner's trial) but the word "July" is stricken out and over it in handwriting is written "January" (which would fix the conversation as having occurred during petitioner's trial). No satisfactory explanation of the alteration appears.
 The witness testified he had no recollection of reading or executing such an affidavit and that the averments thereof did not refresh his recollection. Smith likewise failed to recollect the details of his testimony in the Rena Mooney trial, though the respondent stipulated that the witness had there testified, contrary to his testimony here, that he thought Mellie Edeau had called upon him during the trial of petitioner to explain why her testimony differed from her earlier statement to him. The recollection of the witness was faulty in many other particulars. His testimony in this connection is indefinite and falls short of showing that the witness had informed District Attorney Fickert during the Mooney trial of the asserted "change" in the story of Mellie Edeau.
 Fickert testified herein that Smith did not confer with him until after the Mooney trial and that he did not, as petitioner urges, tell him to keep quiet, that he would make a good witness for the defense. Cunha testified upon this proceeding that at no time during the Mooney trial or on motion for new trial had he ever heard or learned of any prior and assertedly inconsistent statements of Mellie Edeau and that neither Peterson nor Smith informed him of any.
 [21] At this point it is well to note that the testimony of Stout, Burgess, Stewart, Peterson and Smith leaves the testimony of Sadie Edeau unimpaired. The testimony of the named witnesses had for its purpose the establishment of alleged prior inconsistent statements by Mellie Edeau. But, as pointed out earlier in this opinion, Sadie Edeau testified upon all four trials in a manner corroborative of her mother's testimony as to the presence of Billings, Mooney and Rena Mooney in the vicinity of 721 Market Street, and her testimony remains unimpeached. *72
 In addition to the matters already mentioned, there were many other circumstances developed both at the Mooney trial and upon this proceeding that tend to substantiate the testimony of the Edeaus and refute the charge of perjury made against them. Reference may first be had to the testimony herein of police officer Earl Moore, who also testified at all four of the bomb trials, including that of petitioner. He testified that on the day of the explosion he was detailed on the south side of Market Street between Third and Fourth Streets; that he succeeded in removing all automobiles but one from that area; that at about 1:40 or 1:45 P. M. he sounded the horn (a broken Klaxon) of said remaining automobile, an old Ford jitney bus, which was standing in front of 721 Market Street; that several days later he was sent to the North End Police Station, where he again saw the identical automobile (otherwise shown to be Weinberg's jitney bus) with the same broken horn; that when he was sounding the horn on the day of the explosion, a man, whom he identified as Billings upon the several trials and here, came up to him and said the owner "will be here in a minute"; that he was positive Billings was the man he talked with in front of 721 Market Street. The witness identified a police report filed by him on July 31, 1916, wherein he recounted the incident here testified to and described the person to whom he had talked. Generally speaking, the description fitted Billings at the time but for the color of the hair therein designated. This, however, is not fatal in view of the witness's actual subsequent identification of the person as Billings. The witness declared that Thomas Doidge, whose testimony at the Mooney trial was read into this record, was not the man he talked to in front of 721 Market Street and that "the man I saw at 721 Market Street I am positive as I am sitting here was Warren K. Billings".
 Pursuant to the understanding of counsel, there was also read into the present record the testimony of other reputable witnesses given during the trials of certain of the other bomb defendants, which testimony lends color to or tends to substantiate that of the Edeaus. In this category is the testimony of George Robertson and his wife, both now dead. Robertson, then a professor at the University of Redlands, testified at the Rena Mooney and Weinberg trials, in substance, that he and his wife were in the vicinity of 721 *73 Market Street on the day of the explosion at about 1:30 P. M.; that he saw an automobile parked at the curb there which a man shortly thereafter cranked and drove east toward the ferry; and that he also saw a suitcase there behind a box and near the building line. His wife testified at both trials to the same general effect.
 Similarly, we have before us the testimony of Herbert Wade, a school principal in the Hawaiian Islands. Wade testified at the Billings, Mooney and Rena Mooney trials. In substance, he declared that he was in San Francisco on the day of the explosion; that Billings, carrying a heavy suitcase, passed him shortly after 1:00 P. M. in the entranceway of 721 Market Street; that he also saw a man and woman there, the latter resembling Rena Mooney. It is conceded herein that other witnesses testified upon the several trials to having seen Billings in the vicinity of 721 Market Street.
 We are satisfied, upon a consideration of the entire record, and we find and conclude that petitioner has not here established by substantial, credible evidence that either Mellie or Sadie Edeau committed perjury upon his trial and that he has similarly failed to establish any improper conduct upon the part of the prosecuting officials in connection with the production or testimony of said witnesses. However, even were we to conclude that Mellie Edeau has been discredited, as petitioner urges, we would have no alternative but to find and conclude, and we do so find and conclude, that there is no credible evidence connecting the prosecuting officials with any such discrediting circumstance. Proof of such knowledge, as we have already pointed out, is an indispensable requisite of petitioner's cause.
 [22] In our consideration of the charges made against MacDonald, Oxman and the Edeaus, we have purposely refrained from making any reference to the testimony herein of Draper Hand, an ex-police officer. At the time of the explosion, Hand was a "rookie" in the police department of San Francisco. He was assigned to the bomb bureau and in the course of his duties came in contact with many of the prosecution witnesses. Not until 1920, however, did he make certain charges of perjury and frameup in connection with the witnesses Oxman and Edeau, and then only after he admittedly had been associating with and going over the matter for a period of three or four years with Fremont *74 Older, whose activities upon behalf of the bomb defendants had not always been commendable. (Billings report, supra.) It is not our purpose to narrate the charges made by Hand, for he comes to us as a thoroughly discredited and impeached witness. Inconsistencies appear in his statements through the years and much of his testimony herein was flatly contradicted by Fickert, Cunha, Matheson and Goff. In fact, early in this proceeding it appears to have been petitioner's intention not to call Hand as a witness because, as then stated by petitioner's counsel, Frank P. Walsh, "you cannot hand him to me to vouch for his credibility ... we know where he is and we would not vouch for his credibility". In the face of such a declaration by petitioner's counsel, no disappointment should attach to our refusal to accept him as a truthful witness when a subsequent change of policy or strategy by petitioner brought him to the witness chair. Moreover, and under the provisions of section 2051 of the Code of Civil Procedure, Hand stands impeached by reason of his conviction in 1931 or 1932 of grand theft, a felony.
 [23] Petitioner made some effort herein to establish irregularities or improprieties in the conduct of the prosecuting deputy and the foreman of the jury that sat upon his case. Testimony was offered to the effect that throughout the trial the jury foreman was clandestinely meeting with Cunha, the prosecuting attorney, and reporting the reactions of the jury to the evidence and the progress there being made by the prosecution. It was also attempted to be shown that upon the return of the jury to the courtroom with its verdict, the foreman, by drawing his hand across his throat, had signaled or conveyed the verdict to Cunha. What purpose such an asserted signal could serve a few moments prior to the public announcement of the verdict is difficult to perceive. None of the testimony addressed to the jury situation comes within the issues of this proceeding. The referee properly ruled it out on that ground. Much of it was likewise hearsay, and objection thereto was also properly sustained on this ground by the referee. Most of the testimony, therefore, appears in the transcript merely as an offer of proof. We have examined it, however, and conclude that, even if admissible, the persons so testifying lack in persuasiveness and conviction by reason, in some instances, of prior inconsistent statements or conduct, and by virtue of their tardiness in bringing into *75 the light such asserted improper practices. It is difficult to reconcile the testimony herein, on this and other matters, of one of the former counsel in the bomb cases with the statements of said counsel before the members of this court in the 1930 Billings hearing, wherein he asserted he made no charges against the prosecuting officials and was happy they had an opportunity there to exculpate themselves. Said counsel admitted on cross-examination herein that he made no effort during the Mooney trial or on motion for new trial to convey to petitioner's then attorneys the information possessed by him at the time as to the asserted clandestine association between the jury foreman and the prosecuting deputy or as to the alleged signal from the former to the latter. He further admitted he had not divulged the information until after he had been employed as counsel in the Weinberg case and that he "was careless" not to have disclosed it earlier. His testimony is also weakened by prior inconsistent statements. To illustrate: He testified here that he was in the building where the Mooney trial was being conducted "three or four times a week during the time that the trial was going on", whereas inspection of his testimony given at the Oxman preliminary hearing, discussed above, discloses that he there testified that he was sick for three weeks during the Mooney trial and "I wasn't in or about the Hall of Justice during that trial with the exception of one of the first days when they started to impanel the jury". It does not appear how he was able to see the asserted signal from the jury foreman to the prosecutor on the last day of the trial. Moreover, Cunha, the prosecuting attorney, when on the stand herein, denied all of the charges made by his fellow-practitioner. The jury foreman, prior to his death, executed an affidavit, proffered by the attorney-general as an offer of proof to be admitted only in the event petitioner's evidence on the subject was admitted, wherein he denied the material portions of the mentioned charges. The district attorney and his prosecuting deputy when on the stand in this proceeding likewise specifically denied all charges of irregularity or impropriety with any member of the trial jury, and branded as false all testimony to the contrary.
 [24] On the day of the explosion, petitioner and his wife, Rena Mooney, resided in a studio in the Eilers building situate on Market Street between Fifth and Sixth Streets, more *76 than a mile from the scene of the explosion. By way of defense upon his trial and up to the present moment, petitioner has always contended that he and his wife, in company with the latter's sister and aunt, were on the roof of the Eilers building, for the purpose of watching the parade, at the times the prosecution witnesses had them farther east at 721 Market Street and at Steuart and Market Streets. This defense has been grounded principally upon certain photographs purporting to show the group leaning over the parapet of the building at approximately 1:58, 2:01, and 2:04 P. M., respectively. Admittedly, petitioner appears only in the latter two pictures. The pictures were taken by one Wade Hamilton, a young man who was then employed in the Eilers building. Hamilton took the stand in this proceeding and testified, in part, that the pictures were taken by him from the roof of said building principally for the views of the parade depicted therein and that the presence in the foreground of the group above mentioned, including petitioner, was incidental and accidental.
 It appears that shortly after the explosion, the police, in the course of their investigation, came in contact with Wade Hamilton and procured from him the negatives of the pictures so taken by him. Petitioner here testified that when his counsel during the trial requested the pictures they were given "blurred" copies thereof. Thereafter, he testified that upon demand and court order, the negatives were produced and enlarged so as to show the times above indicated on the face of a clock on the street several floors below and considerably easterly of the Eilers building. As so enlarged, they were put in evidence by petitioner upon his trial. It is not our intention to here develop and discuss the innumerable arguments that since have been advanced, pro and con, as to the accuracy or genuineness of the enlargements that purport to make visible the times on the face of a distant clock and thus assertedly fix the times petitioner and his wife were on the roof of the Eilers building. During the trial, apparently no attack was made by the prosecution upon the genuineness of the enlargements. At least petitioner failed to accept the challenge of the attorney-general in this proceeding to point out in the Mooney trial transcript any instance wherein the prosecution questioned the genuineness of said enlargements. In other words, petitioner's alibi defense was *77 fully developed and presented upon the trial, and the jury by its verdict impliedly rejected the same. In the affirmance of the judgment of conviction (People v. Mooney, 177 Cal. 642, 653 [171 P. 690]), this court in 1918 had the following to say about said defense: "Appellant's counsel ... contend that the showing of Mooney's absence from the corner of Steuart and Market Streets at the time when the suitcase was left there is so complete as to amount to a demonstration. ... There was testimony which, if believed by the jurors, would have corroborated this account. Certain pictures were introduced in evidence. These were the work of a young man who photographed the people on the roof of the Eilers building. Some of the photographs showed defendant at that place, which was more than six thousand feet from the corner of Steuart and Market Streets and more than seven thousand feet if a journey were made between the two places by way of Mission Street, which is parallel with Market Street. These pictures also show a clock on a building near by, and according to the time indicated Mrs. Mooney was on the roof at two minutes of two o'clock, and she and her husband were there at one minute after two and at four minutes after two. Assuming that the clocks involved in the testimony were correct, we cannot see that the alibi is, as counsel for defendant contend, scientifically established. All of the testimony regarding the time when the suitcase was placed on the sidewalk merely approximated the hour. The length of time during which the suitcase was seen by the witnesses who testified that they observed it was estimated by them, and we cannot say that within the estimates as given, if they were taken as substantially correct by the jury, the defendant could not have proceeded by automobile from the scene of the purposed explosion to the Eilers building and to the roof before the operation of a time device to detonate the bomb. All of these matters pertaining to the alleged alibi were before the jury. It was for the jurors to say from the evidence whether or not any real alibi was established".
 The foregoing represents the attitude of the attorney-general in this proceeding. He has not undertaken to directly question the genuineness of the enlargements of the Hamilton pictures or the accuracy of the times shown thereon. Rather, has he assumed this, and contended that they are not inconsistent with the prosecution theory that petitioner was also *78 present at 721 Market Street and Steuart and Market Streets as testified by the witnesses Edeau, MacDonald and Oxman. We find no occasion to depart from the earlier disposition of this issue.
 We have mentioned the point having to do with the pictures merely because petitioner asserts herein that as part of the alleged frameup the prosecution, until ordered by the court during his trial to produce the negatives, had furnished him with "blurred" copies from which the time on the clock could not be ascertained. This argument hardly checks with the publication, as part of the defense propaganda, of a pamphlet entitled "The Frame-Up System", which made its first public appearance on December 1, 1916, prior to the commencement of petitioner's trial, and on the first page of which appears a reproduction of one of the Eilers building pictures with an arrow pointing to the clock and printed thereon the following: "Clock under microscope shows one minute past two".
 In this connection, it seems only logical to conclude, also, that if the prosecution were engaged upon the trial in the frameup or suppression charged to them, in all probability they would have suppressed or destroyed the negatives before the trial. Be that as it may, petitioner, as shown, had the full benefit upon his trial of the pictures and the times disclosed thereon.
 While our determination as to the "alibi defense" assertedly established by the Hamilton pictures equally disposes of the attempt to establish this same defense by the testimony of persons on the roof at the time, which testimony was read into the record herein by petitioner, we do not hesitate to state that an examination of the record discloses that the testimony of many of said witnesses failed to place petitioner upon the roof of the Eilers building at the times disclosed by the clock. Moreover, the statements made by any of these same persons to the police shortly after the explosion, which statements were also copied into the record at petitioner's request, disclose, in most instances, that petitioner and his wife did not arrive on the Eilers roof until after 2:30 P. M. on the day of the explosion. However, as already stated, even if petitioner and his wife were on the Eilers roof at approximately 2:00 P. M., it was for the jury to decide whether they had immediately dispatched themselves *79 to that location from Steuart and Market Streets, where the prosecution witnesses placed them. As pointed out above, the jury by its verdict impliedly so resolved.
 [25] At this point, it is well to state that petitioner attempted, without the aid and against the advice of his counsel, to establish herein that the district attorney at the time of trial had sent a message, through a common friend, to petitioner's sister-in-law offering her immunity for her sister, petitioner's wife, in the event she would change the time that they assertedly had gone on to the Eilers roof to watch the parade. All of the principals in the asserted offer, including petitioner's wife, his sister-in- law, the common friend, the district attorney, and petitioner's counsel at the time, failed and refused to testify that such an offer was made by or came through or from the office of the district attorney.
 [26] By the witness Charles A. Griffen, petitioner sought to establish that the witness had informed Fickert that Mooney was not involved in the explosion, because he had seen him on the Eilers roof at approximately 1:45 P. M., and that Fickert assertedly told the witness to remain silent as Mooney should have "been hung long ago". On cross-examination, the witness admitted that though he subsequently read in the newspapers that petitioner was to be hanged he did nothing toward informing the trial court or defense counsel of the matters here narrated by him. Under the circumstances, we conclude the witness is not worthy of belief. In addition, Fickert, while on the stand in this proceeding, denied knowing Griffen and characterized his testimony as false.
 [27] Petitioner next urges that his arrest and prosecution were the result of antipathy upon the part of certain large corporations because of his prior activities in attempting to unionize their employees. Our examination of the record herein satisfies us that this is an assertion unsupported by substantial evidence. The only possible connection shown between the prosecuting officials and said corporate interests was the employment by the district attorney, shortly after the explosion, of one Swanson, now deceased, who formerly had been employed as special agent for the Public Utility Protective Bureau. All other "evidence" relied upon by petitioner to establish this contention is not of a tangible character but such as, at best, merely gives rise to a suspicion. *80 Much of it is hearsay in character and not properly admissible.
 Shortly after the explosion, Swanson was employed by the district attorney as an investigator, at a salary of one hundred and sixty-five dollars a month, solely because of his knowledge, gained through his former employment, of known dynamiters and of the thefts of dynamite from certain places. Such information would naturally serve a most useful purpose in tracking down the then unknown perpetrators of a dastardly crime committed by means of high explosives. The district attorney, his deputies and police officials denied in this proceeding that Swanson produced or coached any witness or in any manner directed the prosecution. The record herein bears them out. The production of MacDonald, Oxman and the Edeaus upon the trial has been accounted for and explained in this record, and we fail to discover therein the hand of Swanson, the alleged arch-conspirator. Nor is there any credible evidence that Swanson ever procured or influenced any witness in the case.
 In contemplated substantiation of the charged conspiracy, petitioner points to the patently hearsay testimony herein of one of his former counsel to the effect that after petitioner's acquittal in Martinez on a prior charge of possession of explosives, one of the attorneys for the utility then involved had stated that they had a "red shirt on the ___ ___ ___ now", meaning petitioner, and would get him. Aside from the hearsay character of the testimony, the declaration may well be said to be open to the construction that the person uttering it was still convinced of petitioner's guilt on the Martinez charge, in spite of his acquittal, and that on some future day petitioner would not again be so fortunate as to escape the consequence of his wrongful acts. The remark is not capable exclusively of an interpretation that they would "get" petitioner by "framing" him. However, were we to consider such hearsay testimony, the effect of it would be more or less balanced or offset by the testimony, also hearsay in character, which attributes to said former counsel a declaration, assertedly made immediately after hearing of the explosion, to the effect that "I bet that is an old client of mine, Tom Mooney, who I defended in Martinez". Fremont Older, during his lifetime an untiring supporter of petitioner, admitted before the members of this court in 1930 that *81 when he heard of the explosion he immediately suspected petitioner. These matters tend to destroy the contention that the charge against petitioner was manufactured out of whole cloth by a corrupt district attorney conspiring with certain antagonistic corporate interests. Moreover, it appears anomalous, at least, that a district attorney, who, according to the uncontradicted testimony herein, was elected to office with the union labor endorsement and had appointed to his staff as deputies, among others, seven persons who had direct union labor affiliations or had been recommended for appointment by union organizations, would prosecute a man for murder solely because of his alleged union activities. Many other matters could be discussed along this line, but they would serve merely to prolong this opinion without changing our conclusion on this phase of the case. We therefore find and conclude on the evidence now before us that petitioner's arrest and conviction were not the result of a frameup or conspiracy engineered or directed by corporate interests or agencies.
 [28] As additional evidence tending to overcome the charges of frameup and perjury, and as pointing to the guilt of petitioner, reference may well be had to the evidence produced upon the trial disclosing the discovery at his residence of certain incriminating articles. In the opinion of this court upon the appeal from the judgment of conviction, supra, at page 645, it was declared that they indicated possession by the petitioner of the means for the perpetration of the crime.
 Upon this proceeding, Detective-Sergeant Proll, who participated in the search of petitioner's studio a few days after the explosion, testified that certain cartridges shown to him after the explosion and apparently constituting a portion of the bomb were similar to cartridges found in petitioner's studio. He also testified that there was found in petitioner's studio at the time four pamphlets, offered in evidence here, issued by the Hercules Powder Company and having to do with the handling of gunpowder and dynamite. This witness testified at several of the bomb trials, including petitioner's trial.
 Arthur B. Riehl, a retired inspector of police, testified in the present proceeding that shortly after the explosion he, with others, searched the basement at the home of Nolan, one of petitioner's original codefendants, and found therein petitioner's motorcycle (which petitioner here admitted he stored *82 in Nolan's basement), certain .32 and .38 calibre cartridges, several pounds of scrap iron, and many ball bearings, all of which were more or less similar to articles found at the scene of the explosion. This witness further testified that there was also found in said basement a box of ignition powder, a package of clay, some sand, and four or five pounds of thermite, fused with aluminum dust. The witness added that he had handled explosives for the police department and that his study of explosives had established to his satisfaction that thermite when fused with aluminum dust is highly explosive and is employed by the United States Government in the manufacture of bombs. Thermite so fused, he added, when confined in a container lined with fireclay or other base, generates an intense heat which, being unable to escape, creates "the strongest explosive there is".
 [29] In passing, we have no hesitancy in rejecting as unworthy of belief the testimony given herein on behalf of petitioner by Warren K. Billings who, although not a party to this proceeding, was likewise convicted of participating in the bomb explosion. There are many matters that serve to deprive Billings' testimony of credibility. He is an admitted burglar. In his earlier life he worked in the mines in Utah, where he acquired a knowledge of dynamite. He admits having stolen eighteen sticks of dynamite on one occasion, and, concededly, he was convicted in 1913 for illegally transporting dynamite to Sacramento, a felony. His 1930 testimony, included herein, discloses that the dynamite was carried by him with the connivance of petitioner, to be used for the destruction of power lines. Admittedly, he had been previously employed by petitioner to walk certain power lines to ascertain the number of guards maintained thereon. At the time of his arrest for the preparedness day parade explosion, Billings resided in the home of Belle Lavin, a known rendezvous for anarchists. He was an acquaintance, at least, of Alexander Berkman, an avowed anarchist, and others of similar character.
 While on the stand in this proceeding, Billings denied having been with petitioner on the day of the explosion. He likewise denied being on Market Street below Grant Avenue, which is considerably west of the scene of the explosion. His testimony indicates that at 1:20 P. M. he proceeded from his home and by a circuitous route finally located himself at *83 Sixth and Market Streets to watch the parade. Other points reached in his devious march failed to offer proper vision of the parade.
 In 1930, when testifying in support of his pardon application, Billings declared that on the day of the explosion, when prosecution witnesses placed him elsewhere, he was engaged in spraying parked automobiles with acid or paint remover, and that at the time of his trial for murder growing out of the bomb explosion he did not inform counsel, court or jury of these acts of sabotage, of misdemeanor character, even though they might have furnished an unimpeachable alibi, particularly when, at the time of his arrest, he still assertedly possessed a cigarette paper on which he had written the license numbers of the automobiles so sprayed. He testified further in 1930 that at the time of trial he felt he could otherwise establish his innocence and had agreed with petitioner herein and Nolan when in jail not to reveal the story of sabotage. He thereupon assertedly smoked the cigarette paper bearing the license numbers. Upon cross-examination in this proceeding, he denied that he had agreed with the petitioner and Nolan to conceal the acid-throwing episode. He admitted he had testified to the contrary in 1930, and attempted to explain herein by stating that he could not presently recall such agreement. Other inconsistencies exist between his 1930 testimony and his present testimony. To be specific, he testified positively in this proceeding that he had been "framed" by the officials and then went on to testify that his 1930 testimony was false wherein he declared he had not been framed, but that his conviction was the result of mistaken opinion by the officials. Moreover, he admitted in 1930 that he has not always spoken the truth when under oath.
 [30] We leave Billings, and direct our attention to the petitioner's activities prior to the explosion, with a view to determining whether his own words and acts tend to demonstrate his connection therewith. A very commonplace rule which plays a large part in the formation of judgments in the affairs of life is incorporated in section 1960, subdivision 2, Code of Civil Procedure, under the heading of "inferences and presumptions." It is there provided that an inference must be founded on a deduction from a fact proved such as may be warranted by a consideration "... of the particular *84 propensities or passions of the person whose act is in question ..." With this rule in mind, we will make reference, as indicative of the propensities of petitioner, to his revolutionary activities which clearly establish his aim and purpose to weaken and undermine, with the view of ultimate destruction, both by violent and insidious means, the entire social and political structure of the nation. Such was the character of his associates and his own professed writings. In other words, he was outspokenly hostile to our system of government. Much could be written of his radical activities, as disclosed by his writings. Petitioner admittedly was the founder of a radical newspaper called The Revolt. Shortly after its demise, and in 1915, petitioner became interested, with the well-known anarchist Alexander Berkman, in the newly-founded revolutionary paper known as The Blast. Copies of said paper were here offered as exhibits. Unquestionably, the paper and its supporters were opposed to this country preparing itself for participation in the World War. We shall not quote from the numerous unpatriotic and defamatory articles of that paper except to refer to one written by the petitioner in the issue of April 1, 1916, which article petitioner here admits has lived to plague him to the present moment. In that article, after referring to those seeking to prolong the war and thus enhance their profits, petitioner concluded by declaring that "This move of the League to trap the workers must be pushed back in the teeth of the Labor crushers". He denies that the quoted sentence had reference to the preparedness day parade. However, he admitted here that he is a social revolutionist and that he opposed the preparedness day parade. Of course, he denies that his opposition called for direct action of the type that greeted the commencement of the parade and which, as shown, left ten dead and many injured.
 For several years prior to 1916, petitioner managed an organization known as the International Workers Defense League, which had for its purpose the defense of all persons under prosecution or conviction for crimes of direct action, including dynamiting. From the writings and other documents here in evidence it is apparent that the guilt or innocence of a person so charged was an immaterial factor. In this connection, petitioner wrote threatening letters, suggesting *85 violence, to the Governors of California and Utah unless certain offenders were accorded their liberty.
 In 1913, petitioner and two persons known as Joseph Brown and H. G. Hanlon, were arrested in Martinez for the possession and transportation by boat of explosives, consisting of certain wire, batteries, an alarm clock, fulminating caps and guns. Although several trials were had, petitioner was never convicted on the charge. He has always maintained the articles were "planted" by antagonistic corporate interests. However, there is testimony in the record herein, given by former counsel for petitioner upon those trials, to the effect that subsequently, and upon affidavit by petitioner, certain of the articles were reclaimed. Petitioner denies having made such an affidavit of ownership. It is also interesting to note that the present record discloses that in May, 1916, two months before the explosion, petitioner made inquiry by letter of Hanlon as to the whereabouts of Brown. Evidence of these and other matters tends to overcome the charge of frameup made by petitioner.
 Points not discussed herein are lacking in merit and do not require further notice.
 [31] For the reasons stated, we conclude that petitioner has not established by substantial, credible evidence that his conviction was the result of perjury on the part of prosecution witnesses or that the prosecuting officers caused or suffered to be introduced at petitioner's trial any testimony which they knew, or had reason to believe, was false, or that they were guilty of suppressing or preventing the introduction of any evidence which, had it been given, would have been favorable to the defense of petitioner at his trial.
 The writ is discharged and the petitioner is remanded.
 LANGDON, J.,
 Dissenting.
 I dissent.
 The question here involved is not the guilt or innocence of Thomas J. Mooney. The issue, as defined by the United States Supreme Court, is whether he was accorded due process of law on his trial for murder. (Mooney v. Holohan, 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406].)
 In this dissenting opinion, no useful purpose would be served by reviewing the evidence. The preponderance of the material, credible evidence in the record leads me to *86 conclude that on his trial petitioner was not accorded due process of law.
 For that reason, the writ of habeas corpus should issue.